# Exhibit 1

**UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF PENNSYLVANIA**

LIFEMD, INC.;                                                )
                                                            )
JUSTIN SCHREIBER;                                            )
                                                            )
and                                                          )
                                                            )
STEFAN GALLUPPI                                              )
                                                            )
     Plaintiffs,                               )
                                                            )
v.                                                           )
                                                            )   C.A. NO. 2:21-cv-640
CHRISTIAN MATTHEW LAMARCO;                                   )   **JURY TRIAL DEMANDED**
                                                            )
CULPER RESEARCH;                                             )
*an entity whose true name/address is presently unknown*     )
                                                            )
and                                                          )
                                                            )
JOHN/JANE DOES 2-10                                          )
*individuals, corporations, organizations, or other legal*   )
*entities whose names and addresses are presently*           )
*unknown,*                                                   )
                                                            )
     Defendants.                                )
_____           )

**COMPLAINT**

Plaintiffs, LifeMD, Inc. ("LifeMD"), Justin Schreiber ("Schreiber"), and Stefan Galluppi

("Galluppi") (collectively "Plaintiffs"), by counsel, as and for their Complaint against Defendants,

Christian Matthew Lamarco ("Lamarco"), Culper Research ("Culper"), and John/Jane Does 2-10

(collectively "Defendants") state and allege as follows:

**NATURE OF ACTION**

1.     This action arises from a classic "short and distort" scheme.

2.      In such a scheme, short-sellers, working in concert with an involved publisher-generator of false information, borrow securities, sell them, and then drive the price of their target company's stock down by knowingly spreading materially false, misleading, defamatory, and disparaging information about the company.

3.      Once the company's stock drops to an artificially low price, the short-sellers repurchase and return the borrowed securities, pocketing the difference.

4.      This is precisely what Defendants have done against Plaintiffs.

5.      Plaintiffs bring this action to recover substantial damages and to obtain injunctive relief against Defendants for their intentional and malicious scheme to artificially manipulate the securities markets in LifeMD's shares by disseminating and publishing false and misleading statements about LifeMD, Schreiber and Galluppi in order to secure a quick and illegal financial windfall.

6.      These false and misleading statements have caused significant harm to Plaintiffs, including but not limited to severe depression of the value of LifeMD's stock, damage to Plaintiffs' reputation, emotional pain, suffering and humiliation, and causing Plaintiffs to suffer a loss in revenue and incur substantial expenses.

## JURISDICTION & VENUE

7.      This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332 because there is complete diversity amongst the parties and the amount in controversy exceeds $75,000.

8.      This Court has personal jurisdiction over Culper Research and John/Jane Does because they purposefully availed themselves of the benefits and protections of the Commonwealth of Pennsylvania by working with Lamarco, a resident of Pittsburgh, Pennsylvania,

2

to defame and commercially disparage Plaintiffs by publishing and/or authoring or contributing to the Culper Report, which was published in Pennsylvania on the Culper Research website and through Twitter.

9.      This Court is a proper venue pursuant to 28 U.S.C. § 1391 because, upon information and belief, a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred within this District.

**PARTIES**

10.     Plaintiff LifeMD, Inc. is incorporated under the laws of Delaware with its principal offices located in New York. LifeMD's common stock trades on the NASDAQ exchange under the symbol "LFMD."

11.     Plaintiff Justin Schreiber is an individual residing in Dorado Beach, Puerto Rico, 00901.  Schreiber is LifeMD's Chairman and CEO.

12.     Plaintiff Stefan Galluppi is an individual residing in Huntington Beach, California. Galluppi is LifeMD's Chief Technology Officer.

13.     Defendant Christian Matthew Lamarco is an individual residing at 3934 Foster Street, B410, Pittsburgh, PA 15201.  On information and belief, Lamarco, at all relevant times, directed, authorized, authored and/or was responsible for the publication of defamatory statements made against Plaintiffs by Culper Research.

14.     Defendant Culper Research is an anonymous short-seller that publishes bogus and purported "investigative investment research" reports through its website at www.culperresearch.com and through postings on Twitter as @CulperResearch.  Culper refuses to disclose the individuals or entities behind it; thus, the exact identity of Culper and its cohorts is not known at this time.

3

15. Defendants John/Jane Does 2–10, whose true names are unknown, are individuals or entities who worked in concert with or for Culper Research in connection with publication and dissemination of the intentionally false and misleading statements about Plaintiffs that Culper Research made public in an internet posting and on Twitter, including members, partners, affiliates, employees, consultants, clients, investors, agents, and/or counsel of or for Culper Research. Plaintiffs will seek leave of court to amend this Complaint and insert the true names of John/Jane Does 2-10 in place of their fictitious names when the same become known to Plaintiffs.

## FACTUAL ALLEGATIONS

**Background Information**

16. LifeMD™ is a leading telehealth company that is transforming the healthcare landscape with direct-to-patient product and service offerings. LifeMD's telemedicine platform enables virtual access to affordable and convenient medical treatment from licensed providers and, when appropriate, prescription medications and over-the-counter products delivered directly to the patient's home.

17. LifeMD offers a full range of subscription-based proprietary telehealth products and services, including: i) REX MD™ - telehealth for men; ii) Shapiro MD™ - telehealth for hair loss; and iii) Nava MD™ - teledermatology offering for women.

18. LifeMD strives to build telemedicine brands that combine best-in-class virtual care with prescription medications (if appropriate) and patented over-the-counter products supported by thought-leading physicians and influencers.

19. LifeMD began as a start-up, financed through multiple rounds of venture capital funding. Some of the most sophisticated institutional investors and advisors in the world have conducted countless hours of extensive due diligence validating LifeMD prior to investing.

20.     LifeMD maintains a network of licensed medical providers and doctors who are board certified to treat patients and dispense prescription medications.

21.     All medical providers prescribing medications for LifeMD brands are regularly monitored for good standing by a third-party company that governs compliance for critical industries such as telehealth.

22.     LifeMD is managed by a seasoned team of experienced and dedicated professionals, including:

- Justin Schreiber (Chairman & CEO) – Schreiber has deep experience in both healthcare and finance and was the largest direct investor in LifeMD prior to the Company raising its first round of institutional capital. Schreiber also serves as the President and founder of JLS Ventures, an investment and capital markets advisory firm that invests in and consults with emerging growth publicly-traded companies. In addition to his capital markets experience, Schreiber previously worked for a global healthcare consulting firm as well as in the foreign currency trading business. He holds a BS in International Business from Elizabethtown College and a BA in International Management from the ICN École de management in Nancy, France; and

- Stefan Galluppi (Chief Technology Officer) – Stefan Galluppi was the Chief Executive Officer of Immudyne PR and the Chief Operating Officer of Immudyne. Galluppi has over ten years of experience in building technology platforms for direct-to-consumer marketing campaigns. Previously, he served as the CTO of Runaway Products, a DRTV driven marketing firm with a core focus on building

5

and optimizing systems to scale campaigns for maximum efficiency and profitability.

23. Culper Research is purportedly an independent stock research firm which disseminates its research reports to the public at-large throughout Pennsylvania and the United States via its website, www.culperresearch.com and through other media. It also represents itself to the public as an anonymous short-seller.

24. On information and belief, Lamarco, as well as others, are employed by, affiliated or associated with, involved in, and/or part of Culper Research.

25. In June 2019, Culper Research created its presence on the web for the apparent purpose of destroying the reputation of and causing harm to various publicly-traded companies as a means to generate illicit profits through short-selling.

26. Culper undertook to appear to the public as a reputable equity research firm by creating an entity with the term "Research" in the name, referring to itself as involved in long and short equity research, purporting to undertake extensive inquiry into LifeMD's (and other companies') operations, and even referring to each of its publications as "research reports."

27. Legitimate equity research firms do not attempt to hide or conceal the authors of their work, are typically affiliated with an investment bank or seek to engage clients to receive ongoing research reports directly by subscription, and do not seek to hide the compensation they might receive as a result of issuing reports.

28. Culper's principal place of business and state of incorporation, if any, are unknown to Plaintiffs as Culper refuses to disclose any information regarding its own business operations, address, or acting principals.

6

29. Culper, through Lamarco and Does, has a history of publishing unfounded, fraudulent "reports" about companies.

30. At the same time, Culper, through Lamarco and Does, engage in abusive "short-selling" of those respective companies' stocks, creating an excess of sellers over buyers, precipitating a dramatic drop in the market price of the affected shares, in order to reap massive profits at the expense of these companies and their shareholders – the very same fraudulent scheme that they have now deployed against Plaintiffs.

31. Several other companies, including CytoDyn, Inc. (https://emerginggrowth.com/the-great-cytodyn-otcqb-cydy-bear-raid-fails-to-impress/), Blink Charging (https://finance.yahoo.com/news/blink-charging-responds-short-report-191846518.html), and CleanSpark, Inc. (https://www.prnewswire.com/news-releases/cleanspark-investigating-short-seller-culper-research-301212791.html), have been victim to similar schemes engaged in by Defendants using false and defamatory "investigative research" reports published by Defendants, which have resulted in those companies' stocks plummeting.

**Defendants Publish False and Defamatory Statements Regarding Plaintiffs**

32. On or about April 14, 2021, Culper, individually and/or in conjunction with Lamarco and Does, published a false and defamatory report concerning Plaintiffs on its website www.culperresearch.com and via Twitter using @CulperResearch.

33. The Report, titled *LifeMD, Inc. ((LFMD): Redwood Redux at RexMD* (hereinafter referred to as the "Report") (attached hereto as Ex. 1), was distributed globally on the internet and has been disseminated or linked to other widely-read websites, including but not limited to seekingalpha.com and threadreaderapp.com.

34. Further, numerous "investor alerts" and "class action notices" citing to and quoting the false and defamatory statements were circulated shortly after the Report was publicized.

35. Defendants' acts in publishing the Report and the Twitter communications are intended solely to drive down the price of LifeMD's common stock so that they may effectuate profitable short sales of that stock.

36. To that end, Defendants sought to have the Report distributed as widely as possible by providing it – and Culper's Tweets – freely to investor news services on the internet.

37. The statements, implications, and meanings set forth in the Report that are identified below are among the many false and libelous statements in the Report.

38. By claiming at the outset of its libelous Report that "all information contained herein is accurate and reliable," Defendants knew and intended that the statements set forth in the Report, including those identified below, would convey false and defamatory implications and meanings concerning Plaintiffs to any person reading it or being informed of its contents and cause panic and uncertainty regarding investment in LifeMD, including and especially in the eyes of LifeMD's shareholders.

39. The purported "research" and "accurate and reliable information … obtained from public sources" in the Report are expressed in absolute terms, not couched or qualified as opinion.

40. The statements, implications, and meanings set forth in the Report, including those identified below, were published by Defendants with malicious motives, as part of their desire to damage Plaintiffs and decrease LifeMD's share price for their own personal gain and to the detriment of LifeMD's shareholders.

41.     At the time of the publication of the Report, Defendants acted with actual malice in that Defendants knew, or were recklessly indifferent to the fact, that the defamatory statements, implications, and meanings, including those identified below, were false.

42.     Defendants took no steps to discuss or confirm the contents of the libelous Report with Plaintiffs prior to its publication.

43.     The following false statements, among others, appear in the Report:

- LifeMD "has implemented an autoshipping/autobilling scheme, failed to honor guarantees, and put in place abusive telemarketing practices." Ex. 1 at 2;

- "[N]umerous LFMD insiders were intimately involved in varying aspects of Redwood [Scientific]'s 'wide-ranging fraud.'" *Id.*;

- "Life MD CEO Justin Schreiber … was a significant shareholder [in Redwood Scientific]." *Id.;*

- "CFO Juan Manual Pinero Dagnery and former CFO Robert Kalkstein were also significant Redwood shareholders." *Id.*;

- LifeMD could be "liable as an instrument to felony distribution of controlled substances." *Id.*

- "LifeMD paid CEO Schreiber 900,000 shares in 2019 – an exorbitant sum – merely for credit card processing services." *Id.* at 3;

- "LifeMD executives have [been] involve[d] in material fraud, namely in Redwood Scientific, prior to joining LifeMD." *Id;*

- "LifeMD now apparently sells OTC ED pills relying on unlicensed doctors." *Id.*;

- "[A]t least 4 current and past LifeMD executives were intricately involved in Redwood." *Id.* at 4;

- "LifeMD's corporate presentation … omits Schreiber and Galluppi's involvement in the Redwood Scientific Fraud." *Id.*;

- LifeMD uses "unlicensed doctors to dispense OTC medications" [and] "is []willfully ignorant of its doctors, or complicit in felonious acts." *Id.* at 2 & 7;

- LifeMD's statements in a December 2020 press release regarding its launch of its "Veritas MD Telehealth Platform" are "filled with hot air" and show

9

"management's willingness to trumpet promotional material while at the same time sweeping uncomfortable truths under the rug." *Id.* at 8;

- "LifeMD is a cash-burning direct marketing response business. The core driver of Rex MD … is a paid search and web marketing operation which only incinerates more shareholder cash over time." *Id.*

- "[I]nsiders have enriched themselves via related-party transactions." *Id.* at 15.

44. In addition to the foregoing, the Report contains a myriad of other errors, distortions, and outright misstatements of fact including, but not limited to, LifeMD's treatment of its shareholders and "covering-up" or hiding information from them, its licensing practices, and LifeMD's relationship with BV Global Fulfillment.

45. Defendants also intentionally provided misleading information by taking information relating to LifeMD's products and financial well-being out of context in order to cause damage and injury to Plaintiffs.

### *Patently False Statements About Involvement With Redwood Scientific*

46. For example, the Report distorts LifeMD executives' involvement with Redwood Scientific Technologies, Inc. ("Redwood Scientific") and explicitly states that Schreiber and Galluppi were engaged in fraud committed by Redwood Scientific.

47. This statement is demonstrably false.

48. No current or former member of LifeMD's management team was involved in decision-making or had significant equity ownership in Redwood Scientific at any time.

49. Schreiber held only a passive investment and non-controlling interest in the company.

50. Further, although Galluppi nominally held the title "CTO", he held no equity in Redwood Scientific and resigned in October 2015, departing more than two and a half years prior to the FTC action against Redwood Scientific.

10

51.     The fact that Schreiber and Galluppi had no involvement in any fraud by Redwood Scientific is confirmed by the filings in *Federal Trade Commission v. Cardiff, et al.,* 5:18-cv-02104 (C.D. Cal. 2018).

52.     The FTC sued Redwood Scientific, other persons, and related entities, asserting unfair and deceptive trade practices.

53.     Neither Schreiber nor Galluppi were sued, and their names do not even appear in the FTC's Uncontroverted Statement of Facts and Conclusions of Law in Support of its Motion for Summary Judgement, the FTC's response to Defendants' Statement of Facts, or the Court's Order Granting Plaintiff's Motion for Summary Judgment, which adopted the facts relied upon by the FTC. *See Federal Trade Commission v. Cardiff, et al.,* 5:18-cv-02104 (C.D. Cal. 2018) DE 423-3, 499-1 & 511.   This information was public and readily available to Defendants when they published the Report.

### *Patently False Statements About LifeMD's Licensing Practices*

54.     The Report outright lies about LifeMD's licensing practices, using Dr. Badii and Dr. Kalter as purported examples of LifeMD's use of unlicensed physicians.

55.     LifeMD's physician network consists of nearly 90 board-certified and monitored medical providers who legally dispense prescription medications.

56.     LifeMD has never allowed an unlicensed medical provider to perform a telehealth consult for any of its brands.

57.     The truth is that Dr. Badii was and still is a medical doctor licensed to treat patients and prescribe prescription medications in multiple states, which can be verified online through a simple web search.

11

58.     LifeMD, through its own quality assurance processes, discovered in March 2021 that Dr. Badii had been sanctioned by the DEA for issues related to prescribing controlled substances, and was barred from prescribing controlled substances.

59.     LifeMD immediately removed him from their physician network.

60.     LifeMD has never prescribed controlled substances, an elementary fact that could easily be verified by anyone that reviewed the company's website and filings with the SEC.

61.     All treatments and medications prescribed by Dr. Badii for LifeMD were lawful and in compliance with all federal and state laws related to prescribing prescription medicine.

62.     In the case of Dr. Kalter, a web design error inadvertently listed Dr. Kalter as licensed in California rather than Massachusetts, where Dr. Kalter is licensed.

63.     As soon as LifeMD realized the error, it immediately fixed it.

64.     Notably, Dr. Kalter never performed a consult or wrote a single prescription for LifeMD in California, even though he would be permitted to do so pursuant to an executive order signed by California's Governor. This information was readily available to Defendants when they published the Report.

### *Patently False Statements About Veritas MD Telehealth Platform*

65.     In their Report, Defendants question LifeMD's press release claims regarding the Veritas MD Telehealth Platform, stating they are "filled with hot air."

66.     Contrary to the Report's misstatements, LifeMD's disclosures about its digital health platform, formerly known as Veritas MD$^{TM}$, are accurate.

67.     Defendants falsely portray LifeMD as a consumer-facing application, when in fact LifeMD serves as the technological and operational backbone behind the REX MD$^{TM}$, Shapiro

12

MD™, and Nava MD™ telehealth products. This information was readily available to Defendants when they published the Report.

### *Patently False Statements About LifeMD's Relationship with BV Global Fulfillment*

68.     The Report also misrepresents LifeMD's relationship with BV Global Fulfillment and JLS Ventures, indicating that insiders are improperly enriched by the transaction.

69.     To the contrary, the rates LifeMD has paid and still pays to BV Global are in line with, if not lower than, what many third-party logistics providers charge for comparable services.

70.     In addition, as is typical in contracting with a third-party logistics provider, LifeMD pays the shipping costs in connection with delivery of its telehealth products to consumers.

71.     Notably, LifeMD's relationship with BV Global is prominently disclosed in all of LifeMD's filings, and this relationship has never been flagged or mentioned as an issue in any audit or due diligence by institutions that have invested into LifeMD. This information was readily available to Defendants when they published the Report.

### *Patently False Statements About Schreiber And JLS Ventures Compensation*

72.     In the Report, Defendants falsely state that LifeMD's 2019 Form 10-K indicates that JLS Ventures earned an astounding 900,000 shares for providing credit card processing services to the company, yet these disclosures have been removed in the Company's 2020 Form 10-K.

73.     In fact, neither Schreiber nor JLS Ventures received any compensation for the credit card processing, a fact clearly stated in LifeMD's 2019 Form 10-K; rather, the referenced shares were incentive based, for Schreiber's work as CEO.

**Plaintiffs Suffer Significant Damage as a Result of the Report**

13

74. Once the Report was published, it was referenced by numerous financial bloggers and websites.

75. Following the publishing of the Report, LifeMD's stock price dropped, and it continues to drop.

76. Moreover, LifeMD has lost potential investors and has suffered injury to its reputation based upon Defendants' publications.

77. As a direct and proximate result of Defendants' unlawful online smear campaign to sabotage Plaintiffs and LifeMD's business and crash its stock price while keeping a profit from their short sale position, Plaintiffs have suffered reputational harm and economic damages.

78. In the immediate aftermath of the publication of the false statements and libel in the Report, the price of LifeMD's shares decreased $2.84, or 24%, to close at $9.00 per share on April 14, 2021, and it continues to plummet.

79. While Defendants published the Report on April 14, 2021, on information and belief, Defendants' attack on LifeMD long before through a "short and distort" scheme.

80. A short and distort scheme is a form of securities fraud wherein an investor and/or company takes a short position on a stock and then publicly berates the stock to influence it to drop.

81. Defendants substantially benefitted from the decline in LifeMD's share price because Defendants began taking large short positions in LifeMD two months prior to the release of the Report.

82. Defendants admit in the Report that the Report's authors had a "short position" in LifeMD in advance of publishing the Report.

83. These large short positions impacted the valuation of LifeMD and its shares.

14

84. While Defendants do not disclose the exact size of the short position, the short interest ratio (the ratio of short interest to float) on LifeMD shares is instructive.

85. NASDAQ, Inc., the exchange on which LifeMD is publicly traded, publishes the short interest for each issuer on its exchange twice a month. Short interest data is reported on mid-month and end-of-month settlement dates.

86. On December 31, 2020, the short interest on LifeMD was 18,352 with an average daily share volume of 187,893 – a 9.77% ratio.

87. On February 12, 2021, the short interest on LifeMD was 420,789 with an average daily share volume of 1,555,062 – a 27.06% ratio.

88. On March 31, 2021, two weeks before the Report was published, the short interest on LifeMD was 1,152,971 with an average daily share volume of 747,679 – a 154.21% ratio.

89. Between February 12, 2021, when Defendants' short and distort scheme began, and April 15. 2021, LifeMD's stock price fell from $29.23 to $8.68 per share – a 70.3% reduction in share price.

90. As a result of Defendants' conduct, Plaintiffs have been irreparably harmed.

91. Defendants' false and misleading statements have caused some readers and potential investors to view LifeMD's business as non-viable, dishonest, and non-reputable.

92. At least two putative shareholder class action lawsuits have been filed against LifeMD, *i.e., Owens Sr. v. LifeMD, Inc.,* Case No. 1:21-cv-03384 (S.D.N.Y. Apr. 2021) and *Cho v. LifeMD, Inc., et al.*, Case No. 1:21-cv-04004 (S.D.N.Y. May 2021), and more may be filed, which incorporate and will continue to spread the false and defamatory statements in the Report.

93. LifeMD has and will continue to incur substantial costs in dealing with these meritless suits, which were a foreseeable and intended by-product of the Report.

94.     LifeMD has incurred additional expenses, and will continue to incur expenses, directly attributable to Defendants' false and libelous Report, including but not limited to attorney's fees incurred in connection with this suit, costs to investigate and defend the defamatory statements made by Defendants, and costs associated with responding to third party inquiries regarding the libelous statements made.

95.     LifeMD has also suffered harm to its reputation and goodwill, including but not limited to, damage to relationships with contractual partners, bankers, lenders, and the media, loss of business opportunities and access to markets and investors, and loss of recruiting opportunities.

96.     As a result of Defendants' libelous scheme, Schreiber and Galluppi have suffered devastating reputational and financial harm.

97.     Their standing in the community has been questioned and discredited.

98.     Shortly after the Report was publicized, there were several social media posts within the investment community questioning Schreiber's and Galluppi's involvement with Redwood Scientific, calling them criminals, accusing them of engaging in fraud, questioning their management of the company, and referring to them as clowns.

99.     As a result, they have suffered personal humiliation, mental anguish, and emotional distress.

100.    The full extent of the damage caused by Defendants is not yet known, but it is clear that Defendants and the libelous Report they created and publicized have already caused Plaintiffs a significant amount of damage and will continue to do so.

### FIRST CAUSE OF ACTION
### Defamation – Libel / Defamation By Implication
### (Plaintiffs v. All Defendants)

16

101. Plaintiffs repeat and reallege the allegations set forth above as though fully set forth herein.

102. Defendants authored, published, and widely disseminated the Report without privilege or authorization.

103. The Report contains statements of fact that are false and/or based upon false or incomplete facts and defamatory impressions about Plaintiffs. The false and defamatory statements, omissions, and implications are referenced above in this Complaint.

104. Defendants authored and caused to be published and broadly disseminated to the public these false and defamatory statements without sufficient factual bases for making the statements, and did so intentionally, maliciously, and with knowledge of their falsity, or at the very least, with reckless disregard for their truth or falsity.

105. As alleged above, given the context in which the false statements appear and the definitive tone of the Report, reasonable investors understood Defendants to be conveying provable facts, not opinions, about Plaintiffs, as demonstrated by the significant decrease in LifeMD's stock following the publication of the Report and the subsequent putative shareholder class actions lawsuit that has been filed.

106. Defendants devised a scheme to fabricate and disseminate the false and defamatory statements to numerous persons through its website (www.culperresearch.com) and its posts on Twitter.

107. Defendants participated in this insidious scheme to profit from the short positions they had built in LifeMD's stock prior to publication of the Report.

108. Defendants knew, or should have known, the statements were false when made.

17

109. Defendants authored and published these false and defamatory statements and/or conspired to disseminate them for the purpose of manipulating LifeMD's stock price to benefit Defendants' short-selling scheme.

110. Defendants' actions have damaged Plaintiffs' reputation and cause Plaintiffs to incur substantial expenses.

111. Defendants' false and defamatory statements have damaged Plaintiffs' relationships with its equity investors, sell-side analysts, debt investors, banks, auditors, lawyers, customers, and suppliers.

112. The false and defamatory statements authored and published by Defendants have injured Plaintiffs and their business and thus constitute libel per se.

113. In addition, as intended and endorsed by Defendants, the statements in the Report led to the defamatory implication that Plaintiffs have engaged in fraudulent and unethical business practices.

114. The publication of the Report and statements therein thus constitutes defamation by implication.

115. Plaintiffs have suffered, and continue to suffer, damages as a direct and proximate result of the false and defamatory statements and innuendo in an amount to be determined at trial.

116. In addition, Defendants have engaged in willful and malicious conduct, or conduct that manifests a knowing and reckless indifference toward, and disregard of, the rights of Plaintiffs.

117. As a result of such conduct, Plaintiffs are entitled to an award of exemplary and punitive damages against Defendants, and all costs, expenses, and attorneys' fees incurred in these proceedings by Plaintiffs.

**SECOND CAUSE OF ACTION**
**Trade Libel**

18

**(LifeMD v. All Defendants)**

118. Plaintiffs repeat and reallege the allegations set forth above as though fully set forth herein.

119. Defendants authored, published, and widely disseminated, without privilege or authorization, the Report.

120. As alleged above, the Report contains statements concerning LifeMD's business that Defendants knew were false and derogatory.

121. Defendants authored and published the false and derogatory statements about LifeMD that were detrimental to the company and Plaintiffs.

122. Defendants conspired to publish and disseminate the false and derogatory statements with the intention of interfering with LifeMD's existing and prospective business relationships and diminishing the value of its business.

123. Defendants' dissemination of these false and derogatory statements was a substantial factor in causing third parties not to have business dealings with Plaintiffs.

124. Defendants' dissemination of these false and derogatory statements also caused a diminution in value of LifeMD's business, as evidenced by the decline in stock price following the large, short accumulation and, further, following Defendants' publication and dissemination of the Report.

125. Defendants' actions have been to LifeMD's detriment.

126. Defendants' fabrication, publication, and dissemination of the false and derogatory statements has damaged LifeMD's reputation, caused LifeMD to lose revenue, and caused it to incur substantial expenses.

19

127. Defendants' misstatements and false innuendo also have damaged LifeMD's relationships with its investors, banks, auditors, lawyers, customers, and suppliers.

128. As a direct result of Defendants' actions, Plaintiffs have incurred special damages including LifeMD having to defend itself against class action lawsuits, costs and fees associated with these lawsuits, and significant expenses in public relations to repudiate the false and defamatory statements made by Defendants, amongst other special damages.

129. Plaintiffs have suffered, and continue to suffer, damages as a direct and proximate result of the false and derogatory statements in an amount to be determined at trial.

130. The foregoing conduct of Defendants is the result of willful and malicious or intentionally fraudulent conduct or conduct that manifests a knowing and reckless indifference toward, and disregard of, the rights of LifeMD.

131. As a result of such conduct, LifeMD is entitled to an award of exemplary and punitive damages against Defendants, and all costs, expenses, and attorneys' fees incurred in these proceedings by Plaintiffs.

**THIRD CAUSE OF ACTION**
**Permanent Injunctive Relief**
**(Plaintiffs v. All Defendants)**

132. Plaintiffs repeat and reallege the allegations set forth above as though fully set forth herein.

133. Defendants authored, published, and disseminated false and defamatory statements about Plaintiffs' business practices for their own profit.

134. Defendants sold short shares of LifeMD's stock prior to the publication of the Report for the sole purpose of profiting from the resulting drop in the share price and have otherwise traded in shares of LifeMD's stock for their financial gain.

20

135. Plaintiffs will suffer irreparable harm if Defendants are not permanently enjoined from authoring, publishing, and disseminating false and defamatory statements about Plaintiffs' business practices because Defendants' continued manipulation of LifeMD's stock threatens the company's existence.

136. Remedies at law are inadequate to fully address the continuing manipulation of LifeMD's stock that has occurred, and continues to occur, as a result of Defendants' actions.

137. Plaintiffs are attempting prevent Defendants from authoring, publishing, and disseminating any further false and defamatory statements in connection with LifeMD.

138. The balancing of the equities substantially favors Plaintiffs.

139. Plaintiffs are entitled to an anti-libel permanent injunction and a mandatory injunction requiring removal of libelous and defamatory statements and publication of appropriate retractions, enjoining Defendants from maintaining, publishing, causing to be published, or disseminating any further false and defamatory statements concerning Plaintiffs.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for relief as follows:

Entry of judgment in favor of Plaintiffs against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, including:

a. Awarding compensatory money damages in an amount to be determined at trial;

b. Awarding punitive damages in an amount sufficient to deter further wrongful and improper conduct;

c. Ordering Defendants to immediately remove all false and defamatory statements concerning Plaintiffs from www.culperresearch.com, the Twitter handle @CulperResearch, and other social media accounts, and requiring Defendants to publish on www.culperresearch.com, the

Twitter handle @CulperResearch, and other social media accounts a written retraction of its previous false and defamatory statements regarding Plaintiffs;

 d. Permanently enjoining Defendants from authoring, publishing, causing to be published, or disseminating any further false and defamatory statements concerning Plaintiffs;

 e. Awarding costs and expenses incurred in connection with this action, including reasonable attorneys' fees to the extent available under any applicable law;

 f. Awarding prejudgment interest at the maximum legal rate applicable to a judgment issued by this Court; and

 g. Such other and further relief as this Court deems just and proper.

Plaintiffs reserve the right to seek all remedies available at law and equity.

Dated: May 13, 2021     Respectfully submitted,


       /s/Jessica G. Lucas
       _____
       S. Manoj Jegasothy, Esquire (PA ID No. 80084)
       Jessica G. Lucas, Esquire (PA ID No. 311280)
       Gordon Rees Scully Mansukhani, LLP
       707 Grant Street, Suite 3800
       Pittsburgh, PA 15219
       Tel: (412) 577-7400
       Fax: (412) 347-5461
       mjegasothy@grsm.com
       jlucas@grsm.com

       *Counsel for Plaintiffs LifeMD, Inc., Justin Schreiber, and Stefan Galluppi*

JS 44 (Rev. 10/20)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

## DEFENDANTS

**(b)** County of Residence of First Listed Plaintiff _____
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant _____
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
S. Manoj Jegasothy, Esquire (PA ID No. 80084); Jessica G. Lucas, Esquire (PA ID No. 311280)
Gordon Rees Scully Mansukhani, LLP
707 Grant Street, Suite 3800
Pittsburgh, PA 15219
Tel: (412) 577-7400

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

| | |
|---|---|
| ☐ 1 U.S. Government Plaintiff | ☐ 3 Federal Question *(U.S. Government Not a Party)* |
| ☐ 2 U.S. Government Defendant | ☒ 4 Diversity *(Indicate Citizenship of Parties in Item III)* |

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☒ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY**   **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane   ☐ 365 Personal Injury - | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product   Product Liability | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | Liability   ☐ 367 Health Care/ | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☒ 320 Assault, Libel &   Pharmaceutical Slander   Personal Injury | | ☐ 820 Copyrights ☐ 830 Patent | ☐ 430 Banks and Banking ☐ 450 Commerce |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers'   Product Liability | | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 460 Deportation |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | Liability   ☐ 368 Asbestos Personal ☐ 340 Marine   Injury Product ☐ 345 Marine Product   Liability | | ☐ 840 Trademark ☐ 880 Defend Trade Secrets Act of 2016 | ☐ 470 Racketeer Influenced and Corrupt Organizations ☐ 480 Consumer Credit (15 USC 1681 or 1692) |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | Liability   **PERSONAL PROPERTY** ☐ 350 Motor Vehicle   ☐ 370 Other Fraud | **LABOR** ☐ 710 Fair Labor Standards | | ☐ 485 Telephone Consumer Protection Act |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle   ☐ 371 Truth in Lending | Act | **SOCIAL SECURITY** | ☐ 490 Cable/Sat TV |
| ☐ 190 Other Contract | Product Liability   ☐ 380 Other Personal | ☐ 720 Labor/Management | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/ |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal   Property Damage | Relations | ☐ 862 Black Lung (923) | Exchange |
| ☐ 196 Franchise | Injury   ☐ 385 Property Damage ☐ 362 Personal Injury -   Product Liability | ☐ 740 Railway Labor Act ☐ 751 Family and Medical | ☐ 863 DIWC/DIWW (405(g)) ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| | Medical Malpractice | Leave Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS**   **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights   **Habeas Corpus:** | ☐ 791 Employee Retirement Income Security Act | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information Act |
| ☐ 220 Foreclosure | ☐ 441 Voting   ☐ 463 Alien Detainee | | ☐ 870 Taxes (U.S. Plaintiff | ☐ 896 Arbitration |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment   ☐ 510 Motions to Vacate | | or Defendant) | ☐ 899 Administrative Procedure |
| ☐ 240 Torts to Land | ☐ 443 Housing/   Sentence | | ☐ 871 IRS—Third Party | Act/Review or Appeal of |
| ☐ 245 Tort Product Liability | Accommodations   ☐ 530 General | | 26 USC 7609 | Agency Decision |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities -   ☐ 535 Death Penalty Employment   **Other:** | **IMMIGRATION** ☐ 462 Naturalization Application | | ☐ 950 Constitutionality of State Statutes |
| | ☐ 446 Amer. w/Disabilities -   ☐ 540 Mandamus & Other Other   ☐ 550 Civil Rights | ☐ 465 Other Immigration Actions | | |
| | ☐ 448 Education   ☐ 555 Prison Condition ☐ 560 Civil Detainee -   Conditions of   Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

| | | | | | | |
|---|---|---|---|---|---|---|
| ☒ 1 Original Proceeding | ☐ 2 Removed from State Court | ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened | ☐ 5 Transferred from Another District *(specify)* | ☐ 6 Multidistrict Litigation - Transfer | ☐ 8 Multidistrict Litigation - Direct File |

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing _____

Brief description of cause: _____

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

DEMAND $ _____

CHECK YES only if demanded in complaint:
**JURY DEMAND:** ☒ Yes   ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):* JUDGE _____ DOCKET NUMBER _____

| | |
|---|---|
| DATE 05/13/2021 | SIGNATURE OF ATTORNEY OF RECORD /s/Jessica G. Lucas |

**FOR OFFICE USE ONLY**

RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____

JS 44A REVISED June, **2009**
IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF PENNSYLVANIA
THIS CASE DESIGNATION SHEET MUST BE COMPLETED

**PART A**

    This case belongs on the    ◯ Erie    ◯ Johnstown    ◉ Pittsburgh) calendar.

**1. ERIE CALENDAR**  If cause of action arose in the counties of Crawford, Elk, Erie, Forest, McKean. Venang or Warren, OR any plaintiff or defendant resides in one of said counties.

**2. JOHNSTOWN CALENDAR**  If cause of action arose in the counties of Bedford, Blair, Cambria, Clearfield or Somerset OR any plaintiff or defendant resides in one of said counties.

**3.** Complete if on **ERIE CALENDAR:** I certify that the cause of action arose in_____
    County and that the _____resides in_____County.

**4.** Complete if on **JOHNSTOWN CALENDAR:**  I certify that the cause of action arose in
    _____County and that the_____resides in _____County.

**PART B** (You are to check ONE of the following)

**1.** ◯  This case is related to Number_____      Short Caption_____._____

**2.** ◉  This case is not related to a pending or terminated case.

DEFINlTIONS OF RELATED CASES:

CIVIL:  Civil cases are deemed related when a case filed relates to property included in another suit or involves the same issues of fact or it grows out of the same transactions as another suit or involves the validity or infringement of a patent involved in another suit EMINENT DOMAIN:  Cases in contiguous closely located groups and in common ownership groups which will lend themselves to consolidation for trial shall be deemed related.
HABEAS CORPUS  CIVIL RIGHTS:  All habeas corpus petitions filed by the same individual shall be deemed related. All pro se Civil Rights actions by the same individual shall be deemed related.

**PARTC**

I. CIVIL CATEGORY (Select the applicable category).

   1. ◯    Antitrust and Securities Act Cases
   2. ◯    Labor-Management Relations
   3. ◯    Habeas corpus
   4. ◯    Civil Rights
   5. ◯    Patent, Copyright, and Trademark
   6. ◯    Eminent  Domain
   7. ◯    All  other federal question cases
   8. ◉    All  personal  and property damage tort cases,  including  maritime,  FELA, Jones Act, Motor vehicle, products liability, assault, defamation,  malicious  prosecution, and false arrest
  **9.** ◯    Insurance indemnity, contract and other diversity cases.
  **10.** ◯    Government Collection Cases (shall include HEW Student Loans (Education), V A  0verpayment, Overpayment of Social Security, Enlistment Overpayment (Army, Navy, etc.),  HUD Loans, GAO Loans (Misc. Types), Mortgage Foreclosures, SBA Loans, Civil Penalties and Coal Mine Penalty and Reclamation Fees.)

    I certify that to the best of my knowledge the entries on this Case Designation Sheet are true and correct

    Date: _____        _____

                                         ATTORNEY AT LAW

 NOTE: ALL SECTIONS OF BOTH FORMS MUST BE COMPLETED BEFORE CASE CAN BE PROCESSED.

## INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

### Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.(a)** **Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

**(b)** **County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

**(c)** **Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.** **Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.
United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.
United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; **NOTE: federal question actions take precedence over diversity cases.**)

**III.** **Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.** **Nature of Suit.** Place an "X" in the appropriate box. If there are multiple nature of suit codes associated with the case, pick the nature of suit code that is most applicable. Click here for: Nature of Suit Code Descriptions.

**V.** **Origin.** Place an "X" in one of the seven boxes.
Original Proceedings. (1) Cases which originate in the United States district courts.
Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441.
Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.
Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.
Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.
Multidistrict Litigation – Transfer. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.
Multidistrict Litigation – Direct File. (8) Check this box when a multidistrict case is filed in the same district as the Master MDL docket.
**PLEASE NOTE THAT THERE IS NOT AN ORIGIN CODE 7.** Origin Code 7 was used for historical records and is no longer relevant due to changes in statue.

**VI.** **Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** Example: U.S. Civil Statute: 47 USC 553 Brief Description: Unauthorized reception of cable service.

**VII.** **Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
Demand. In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.** **Related Cases.** This section of the JS 44 is used to reference related pending cases, if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.

# EXHIBIT 1



## Disclaimer

By downloading from or viewing material on this website you agree to the following Terms of Service. Use of Culper Research's ("Culper") research is at your own risk. In no event should Culper or any affiliated party be liable for any direct or indirect trading losses caused by any information on this site. You further agree to do your own research and due diligence, consult your own financial, legal, and tax advisors before making any investment decision with respect to transacting in any securities covered herein. You should assume that Culper (possibly along with or through our members, partners, affiliates, employees, and/or consultants) along with our clients and/or investors has a position in any securities covered herein. Following publication of any research, we intend to continue transacting in the securities covered herein, and we may be long, short, or neutral at any time hereafter regardless of our initial recommendation, conclusions, or opinions. Research is not investment advice nor a recommendation or solicitation to buy securities. To the best of our ability and belief, all information contained herein is accurate and reliable, and has been obtained from public sources we believe to be accurate and reliable, and who are not insiders or connected persons of the securities covered herein or who may otherwise owe any fiduciary duty or duty of confidentiality to the issuer. However, such information is presented "as is," without warranty of any kind – whether express or implied. Culper makes no representation, express or implied, as to the accuracy, timeliness, or completeness of any such information or with regard to the results to be obtained from its use. Research may contain forward-looking statements, estimates, projections, and opinions with respect to among other things, certain accounting, legal, and regulatory issues the issuer faces and the potential impact of those issues on its future business, financial condition and results of operations, as well as more generally, the issuer's anticipated operating performance, access to capital markets, market conditions, assets and liabilities. Such statements, estimates, projections and opinions may prove to be substantially inaccurate and are inherently subject to significant risks and uncertainties beyond Culper's control. All expressions of opinion are subject to change without notice, and Culper does not undertake to update or supplement this report or any of the information contained herein. You agree that the information on this website is copyrighted, and you therefore agree not to distribute this information (whether the downloaded file, copies / images / reproductions, or the link to these files) in any manner other than by providing the following link — http://www.culperresearch.com The failure of Culper to exercise or enforce any right or provision of these Terms of Service shall not constitute a waiver of this right or provision. If any provision of these Terms of Service is found by a court of competent jurisdiction to be invalid, the parties nevertheless agree that the court should endeavor to give effect to the parties' intentions as reflected in the provision and rule that the other provisions of these Terms of Service remain in full force and effect, in particular as to this governing law and jurisdiction provision. You agree that regardless of any statute or law to the contrary, any claim or cause of action arising out of or related to use of this website or the material herein must be filed within one (1) year after such claim or cause of action arose or be forever barred.

Exhibit 1

## LifeMD, Inc. (LFMD): Redwood Redux at RexMD

We are short LifeMD, Inc. ("LFMD", "the Company", f.k.a. Conversion Labs), as we think that LifeMD is a cash-burning charade which runs afoul of numerous FTC regulations and could suffer the same fate as Redwood Scientific ("Redwood"), which collapsed after facing federal charges. Importantly, LifeMD executives – including CEO Justin Schreiber, CTO Stefan Galluppi, and the Company's two former CFOs – have apparently covered up their involved in Redwood Scientific's "wide ranging fraud", which we think LifeMD now mirrors. Namely, LifeMD appears to use unlicensed doctors to dispense OTC medications, has implemented an autoshipping/autobilling scheme, failed to honor guarantees, and put in place abusive telemarketing practices.

LifeMD's OTC erectile dysfunction ("ED") business touts its use of "Real Doctors" licensed in 46 states, yet lists just 3 doctors on its site. The very first of these doctors is Dr. Roozbeh Badii, whose DEA registration was revoked in October 2020, and who has seen disciplinary actions or suspensions in at least 8 states, including a license suspension in Florida. Not only does this render LifeMD's claims patently false, but potentially leaves the Company liable as an instrument to felony distribution of controlled substances. LifeMD also claimed Dr. Joshua Kalter to be "licensed in California", yet we found no record of Kalter ever being licensed in the state.

In October 2018, Redwood was [charged by the FTC](#) for "wide-ranging fraud" which implemented unlawful autoshipping, abusive telemarketing, and false claims of its products. At LifeMD, numerous customer reviews lead us to believe that the Company has implemented the same tactics. LifeMD touts its "recurring revenue" model yet we think much of the Company's revenues are generated under false pretenses of "one-time purchases".

Undisclosed to current LifeMD investors, numerous LFMD insiders were intimately involved in varying aspects of Redwood's "wide ranging fraud." LifeMD CEO Justin Schreiber is listed as agent in Redwood's initial formation materials, and was a significant shareholder. Additionally, both LifeMD's most recent CFO Juan Manual Pinero Dagnery and former CFO Robert Kalkstein were also significant Redwood shareholders. Finally, while LFMD disclosed in 2016 that CTO Stefan Galluppi previously served as Redwood's CTO, this disclosure was removed from Company materials in 2017, and Galluppi omits this "experience" from his LinkedIn biography, effectively covering up involvement from current LifeMD investors.

We find LifeMD's claims to be a "leading telehealth" company flaccid. LifeMD has just 4 software-related employees on LinkedIn, and has capitalized a mere $438,136 in cumulative software development costs. Instead, we think LifeMD and its RexMD brand are best characterized as on a capital-incinerating advertising treadmill. Investors make favorable comparisons to Hims & Hers (HIMS), yet RexMD and Shapiro MD generate an estimated 39.3% and 44.6% of their website visitors from paid search and Facebook vs. just 8.8% for HIMS. We estimate this means RexMD spends over $36 to generate a single visitor to its website, a rate nearly 18 times higher than for HIMS with an acquisition cost just over $2. In Q4 2020, we estimate LFMD spent $18.0 million on RexMD advertising, just for the brand to generate $6.4 million in revenues. We think this venture could easily be replicated for anyone else willing to incinerate capital at such a torrential rate.

Moreover, while investors consider LifeMD a "growth" company, web traffic data show that RexMD visits peaked in December 2020, while traffic data for Shapiro MD has declined precipitously over the past 6 months. LifeMD has yet to report Q1 results, but we don't think this data bodes well for the Company.

That said, this torrential cash burn hasn't stopped LFMD insiders from using the Company as a personal piggy bank. In 2020, $37.0 million in stock compensation was paid to insiders, not to mention numerous related party transactions. CEO Schreiber's father warehouses and fulfills the Company's Shapiro MD shampoo orders, and

Culper Research                 LifeMD, Inc. (NASDAQ:LFMD)                 April 14, 2021

LifeMD paid CEO Schreiber 900,000 shares in 2019 – an exorbitant sum – merely for credit card processing services. We also estimate LFMD pays Schreiber 2x to 3x the prevailing market rent for its Puerto Rico office space, illustrating that Schreiber appears willing to grift shareholders even in the most trivial considerations, by any means possible. We think the Company will need to dilute shareholders further to keep the charade alive.

LFMD CEO Schreiber casts himself as a tech-conscious healthcare executive, yet even apart from his Redwood involvement, he has been involved at several additional effective penny stock "zeroes." Investors in LFMD ought to look to schemes such as Advaxis (ADXS), Clean Coal Technologies (CCTC), Oxis (GTBP), and Cardax (CDXI) to see how Schreiber's tragic comedies tend to unfold.

LFMD's CFO office has been a revolving door with 3 CFOs since March 2019, the most recent of whom departed on April 2, 2021 – just a single day after a tranche of his options vested. LFMD has also cycled through 4 audit firms in the past 5 years, none of whom are "Big 4". We find the stock uninvestible and are short.

## LifeMD Executives Omit "Wide Ranging" Redwood Scientific Fraud from Their Resumes

We are highly concerned that LifeMD executives have not disclosed their involvement in material fraud, namely in Redwood Scientific, prior to their joining LifeMD. We find this especially concerning in light of the business practices we believe are occurring at LifeMD which mirror those that landed Redwood federal charges.

Redwood claimed, in part, to "develop and market consumer homeopathic drugs and supplements … All the company's products are sold either through a membership subscription model (a direct marketing program) or at any given number of retail locations." Redwood even claimed a revolutionary product for erectile dysfunction, just as LifeMD now apparently sells OTC ED pills relying on unlicensed doctors. However, in October 2018, the FTC took notice and prosecuted Redwood for what they called a "wide ranging scheme of fraud and deception."



Furthermore, the Defendants not only executed the fraud at Redwood, but after it was discovered, were found to have lied and obstructed the Courts, hiding their millions in illicit proceeds generated from the scheme. We believe many of these same practices have made their way to LifeMD, where the Company is now subjecting itself to the same risks.

Culper Research                    LifeMD, Inc. (NASDAQ:LFMD)                    April 14, 2021

Apparently unbeknownst to LifeMD investors, at least 4 current and past LifeMD executives were intricately involved at Redwood:

- LifeMD CEO Justin Schreiber was Redwood's own formation agent and incorporator listed in the Redwood's initial Puerto Rico formation documents. He was also a significant shareholder.

- LifeMD CTO Stefan Galluppi was Redwood's CTO. LFMD initially disclosed Galluppi's history with Redwood in its 2016 Form 10-K, yet removed these disclosures in 2017.

- LifeMD former CFO Juan Manual Pinero Dagnery was a significant Redwood shareholder.

- Finally, LifeMD former CFO Robert Kalkstein was a significant Redwood shareholder. LifeMD's investor presentation omits Redwood from Schreiber's, Galluppi's, and Pinero Dagnery's biographies, in our view suggesting a cover-up attempt after the fraud was discovered.[1]

LifeMD's corporate presentation touts its supposed "proven management team" yet the slide conspicuously omits Schreiber and Galluppi's involvement in the Redwood Scientific Fraud:



Despite Schreiber's involvement in Redwood, LifeMD makes just a single reference to Redwood in its 2016 Form 10-K, which discloses Galluppi's involvement as Redwood's CTO:

---

[1] For full primary source evidence of each executive's role, see our appendix at the end of this report.

> **Stefan Galluppi, Chief Executive Officer, Immudyne PR**
>
> Stefan Galluppi is the Chief Executive Officer of Immudyne PR and the Chief Operating Officer of Immudyne. Previously, Mr. Galluppi served as CTO at Redwood Scientific Technologies, where he oversaw the information technology infrastructure, ranging from customer services software to Customer Relationship Management (CRM) systems, as well as software system development and integration to streamline the B2C ordering process. Mr. Galluppi was also instrumental in helping create the framework for an optimal back-end office infrastructure to support multiple national TV direct response advertising campaigns rated among the top 10 on the national TV IMS report rankings for performance. Mr. Galluppi's the former co-founder of a NT1 Hosting; a web development, hosting and online marketing firm that design, developed and marketed hundreds of successful websites and campaigns.

However, in the Company's 2017 Form 10-K, the Company has removed all references to Redwood, suggesting, in our view, a cover-up attempt:

> **Stefan Galluppi, Former Director and Chief Executive Officer, Immudyne PR**
>
> Stefan Galluppi was the Chief Executive Officer of Immudyne PR and the Chief Operating Officer of Immudyne. Stefan Galluppi is the Chief Executive Officer of Immudyne PR and the Chief Operating Officer of Immudyne. Mr. Galluppi resigned as a Director of Immudyne, Inc. in February 2018 upon the sale of the legacy beta glucan business.

## LifeMD Practices Mirror the Redwood Scientific Fraud

In light of the Company's apparent cover-up of involvement in the "wide-ranging fraud" at Redwood (per the FTC), we are particularly concerned by LifeMD practices which we think mirror those at Redwood. In short, we think LifeMD's business is fatally flawed, unsustainable, and likely to draw regulatory scrutiny, especially in light of Schreiber and Galluppi's histories:

| Redwood Allegations, per the FTC | Culper Research Views on LifeMD |
|---|---|
| "Defendants … bilked consumers out of millions of dollars through baseless advertising claims for products that purport to alleviate serious health conditions… rely on false or unsubstantiated claims…" | LFMD claims its "real doctors" are registered in 46 states, yet the very first doctor touted by RexMD has numerous disciplinary actions and a revoked DEA registration. Dispensing pills without a valid license is a felony offense. |
| "…autoship continuity plans bill consumers monthly for unwanted products… Defendants also make it difficult for consumers to cancel those plans and get their money back." | LFMD touts "ARR from subscriptions" yet we think much of this business originates from autoship programs unbeknownst to customers. |
| "The complaint also alleges that the defendants did not honor their "money-back" guarantee…" | LifeMD offers varying "guarantees" ranging from 60 days to 90 days. Customer reviews allege that these guarantees are not honored. |
| "Defendants have turned to abusive telemarketing practices by delivering prerecorded marketing messages to millions of consumers." | LifeMD product reviews allege a pattern of similar conduct, including abusive marketing phone calls. |

Culper Research             LifeMD, Inc. (NASDAQ:LFMD)             April 14, 2021

LifeMD's two core businesses are Shapiro MD (hair loss products at 57% of 2020 product revenues) and RexMD (ED pills and associated products at 42% of 2020 product revenues). We've found highly problematic practices at both Shapiro MD and RexMD.

## RexMD's "Best Physicians" and "Real Doctors" – Meet Dr. Roozbeh Badii

RexMD claims to offer "telemedicine for men", which in practice means generic ED pills are prescribed through doctors over the internet. On the Q4 2020 conference call, CEO Schreiber stated that, "our vision has always been to radically change health care by making access to the best physicians, diagnosis and treatment, easily accessible, convenient and affordable." Perhaps Schreiber has a different definition of "the best physicians", as the very first doctor listed by RexMD – Roozbeh Badii – has had his license to practice suspended or otherwise revoked in several states, including Florida, where the Company still claims he is licensed to practice:



In May 2020, the State of Virginia suspended Badii's license in connection with his failure to cooperate with an investigation of his telemedicine prescribing practices:

Dr. Badii was licensed by the Board to practice medicine in the State of Maryland on October 17, 2011. His license expired on September 30, 2018.[3] In or around February 2018, the Board initiated an investigation of Dr. Badii, under case number 2218-0147B, following a complaint filed by a pharmacy benefit management organization regarding Dr. Badii's telemedicine prescribing practices. As part of this investigation into Dr. Badii's prescribing practices, the Board issued a subpoena to Dr. Badii for the complete medical records of ten patients and a subpoena to Dr. Badii to appear at the Board for an interview on July 12, 2018. Dr. Badii failed to comply with either subpoena despite numerous requests for the information.[4]

On March 31, 2021, the DEA published notice of the revocation of Badii's DEA registration, following the State of Virginia. The order noted that it is a felony to dispense controlled substances without a current valid license:

> Board of Medicine's decision to suspend Respondent's medical license also means that Respondent is currently without authority to dispense controlled substances under the laws of Virginia. See, *e.g.*, Va. Code Ann. §§ 54.1-2409.1 (2021) (felony to prescribe controlled substances without a current valid license); 54.1-2900 (2021); 54.1-3401 (2021).

- In October 2020, the State of Connecticut suspended Badii's license, characterizing his continued practice as "a clear and immediate danger to the public health and safety."

- In December 2020, the State of Florida suspended Badii's license after having previously placed conditions on his license in November 2017, hence RexMD's claim that Badii is licensed in Florida is false.

- Badii was also reprimanded or placed on probation in Maryland (November 2016), Ohio (February 2017), New York (September 2017), Michigan (March 2018), California (June 2018), and Massachusetts (September 2019).

We question why LifeMD would work with – and even promote – such a doctor in its materials, given Badii's history. This suggests, in our view, that LifeMD is either willfully ignorant of its doctors, or complicit in felonious acts. We're not sure which is worse. Moreover, the fact that this is the very first doctor listed calls into question the doctors which remain unnamed by the Company.

## RexMD Also Appears to Have Falsely Claimed Dr. Joshua Kalter is Licensed in California

Prior to Dr. Badii, a November 2019 archived version of RexMD's website claimed another one of its doctors was Dr. Joshua Kalter, a licensed physician in California:



However, the Medical Board of California shows zero results for any licensed doctors by the name of Joshua Kalter, indicating that Kalter has never in fact held a license in California as claimed by RexMD. Docinfo reports that Dr. Kalter is licensed only in the state of Massachusetts, where a simple Google search also reveals that he resides. We call on LifeMD to disclose a full list of its so-called "fully licensed" physicians who have prescribed drugs for the Company in the past 24 months.

## LifeMD Calls Itself a "A Telehealth Leader"; We Think It's a Direct Marketing Cash Pit

In December 2020, LifeMD (then Conversion Labs) claimed to have launched its "Veritas MD Telehealth Platform", yet we find the press release claims filled with hot air. LifeMD claimed that:

- "Veritas MD integrates patient electronic health records and health care provider workflows across the company's existing telehealth platforms, which includes a 50-state physician network, a leading online pharmacy, and in-house telehealth product development lab."

- "Our official launch of Veritas MD represents the culmination of years of development by experts in technology, medicine, and regulatory affairs," and

- "The state-of-the-art telemedicine technology that forms the foundation of Veritas MD has also transformed the scalability and agility of the company's entire operations."

Back in the real world however, we were unable to find that Veritas MD was even available for public use. We found no associated apps on either the iOS or Android stores, nor could we determine any method by which consumers could sign up for the supposedly "state-of-the-art" telehealth service. Indeed, Veritas MD's website only offers rudimentary graphic depictions of an apparently non-existent app, and a contact form for interested service providers. Per the Q4 2020 conference call in March 2021, the Company now claims Veritas MD is being rebranded and that "we're aiming to launch it this summer." We thus ask the Company under what conditions it felt qualified to issue a press release claiming a "launch" in December 2020. We find the claims indicative of management's willingness to trumpet promotional material while at the same time sweeping uncomfortable truths under the rug.

LifeMD still has just 38 employees on LinkedIn (its annual report claims 56 total employees), only 4 of which we determine to be in technology or software development roles. The Company has capitalized a mere $438,136 in cumulative software development costs, while it the Company's R&D or technology expenses – if it has any – don't rise to the level of disclosure in its financial statements. For reference, Teladoc (TDOC) spent $164.9 million in technology and development expenses in 2020, while American Well (AMWL) spent $84.4 million in research and development in 2020. We find LifeMD's claims to have committed to "years of development" which resulted in a "leading telemedicine business" flaccid.

Instead, we think LifeMD is a cash-burning direct marketing response business. The core driver of Rex MD, the Company's pill-pushing business, is a paid search and web marketing operation which only incinerates more shareholder cash over time. In order to generate traffic to its website, the Company must spend heavily on Facebook and paid search ads. Top keywords include "Viagra online", "generic Viagra", and "Cialis". SimilarWeb indicates that RexMD and Shapiro MD traffic originating from Paid Search and Facebook is multiples higher than for Hims. We estimate that RexMD spent $18.0 million in marketing spend in Q4 2020 alone, almost rivaling Hims despite the Company generating just $6.45 million in revenues compared to $40.1M for Hims:

Culper Research                    LifeMD, Inc. (NASDAQ:LFMD)                    April 14, 2021

| (per SimilarWeb) | Hims | Shapiro MD | RexMD |
|---|---|---|---|
| Traffic via Paid Search & Facebook | 8.8% | 44.6% | 39.3% |
| US Website Rank | 3,873 | 167,589 | 44,690 |
| Total Monthly Visits | 2,870,000 | 45,000 | 165,960 |
| Est. Marketing Spend (Q4 2020) | $19.3M | $2.00M | $18.00M[2] |
| Online Revenues (Q4 2020) | $40.1M | $3.75M | $6.45M |
| Marketing Cost per Website Visitor | $2.24 | $14.81 | $36.15 |

Thus, for each visitor to its site, we calculate RexMD spends over $36, Shapiro MD spends nearly $15, while HIMS spent just over $2. Investors have favorably compared LifeMD to companies such as Hims & Hers (HIMS), yet we think LifeMD is an industry laughingstock in comparison. We think RexMD is easily replicable for anyone willing to recruit shady doctors and light millions in marketing spend on fire each quarter. SimilarWeb shows visits to RexMD peaked in Q4 2020, while visits to Shapiro MD have also fallen significantly over the past 6 months. LifeMD has yet to report its full Q1 2021 results:



---

[2] Prior to RexMD's founding, LifeMD spent ~$2.0M/quarter in sales & marketing. Since RexMD's founding, sales and marketing have ballooned to $20.0M in Q4 2020. Thus, we assign the incremental $18.0M to RexMD.



## ARR From Subscriptions, Autoshipping, Cancellations, and "Money Back Guarantees"

Apart from the Company's apparent use of unlicensed doctors to dispense pills, we think LifeMD's current business practices mirror the same ones which landed Redwood in hot water. Namely, numerous customer reviews allege that the Company engages in autoshipping, makes cancellations difficult if not impossible, and telephones consumers possibly in violation of TCPA laws.

LifeMD touts its supposed "recurring revenue" generated from subscriptions, which in Q4 2020 amounted to 82% of total Company revenues. On the Company's most recent conference call, CEO Schreiber himself admits to autoshipping, as he states, "it's truly recurring basis every month. It's auto-shipped, auto-charged." This line rings familiar to the one touted by Redwood, which claimed to sell product through a "membership subscription" model. However, just as for Redwood, we think many customers are effectively duped into purchasing subscriptions rather than one-time purchases. See for example a review by "Lady Alopecia"[3] which, even as she compliments the shampoo itself, encourages her readers to order from Amazon, rather than directly from the Company, as it appears "Shapiro is running a kind of scam":

> ## Disclaimer: A word of warning!!
>
> Update Dec 2020: It looks like not ALL reviews are positive after all. I've had two people write to me this week saying that Shapiro MD is running a kind of scam where they a) ship you products you didn't ask for or b) refuse to accept returns and will charge your card anyway. That's why I would advise: DO NOT buy direct from the manufacturer!! Order from Amazon instead – you still get the benefits of the shampoo but without getting signed up for an auto-renew policy. 🙂

See a table of recent Shapiro MD reviews via Sitejabber, a few of which note product purchases through Facebook:

---

[3] Alopecia areata is a condition which causes sudden hair loss in small patches. It affects both women and men.

Culper Research          LifeMD, Inc. (NASDAQ:LFMD)          April 14, 2021

| Date | Review Comments |
|------|-----------------|
| 8/14/2020 | I only ordered once via Facebook. It took nearly a month for the order came then a week later I got automatic charge to my account for the next order which I did not authorize. I tried to call customer service and got no response yet. I'm very frustrated with this company. I just wanted to return all the products and do not want to have any further business with this company. |
| 4/24/2020 | I thought the purchase for 4 months was only 50 some dollars and it came up as 200 and something. Not impressed |
| 2/1/2020 | I simply want to reorder the shampoo and the foam for one month and at every turn you are trying to sell me packages and things I am not interested in. Then I cannot add more than one item to a single order. Your website is designed to boost sales through the creation of customer frustration. It really sucks. |
| 3/2/2020 | I received and used my product for a month. After experiencing increased hair loss the look of greasy hair. I stopped. Called customer service to use the guarantee and was told that because I contacted customer service previously that it voided the guarantee. I am 100% dissatisfied and stuck with three months of your 'product'. I am issuing a complaint to FB. |

Reviews of this kind are not unique to Sitejabber nor to Shapiro MD; see a table of recent RexMD customer reviews via Trustpilot:

| Date | RexMD Review Comments |
|------|-----------------------|
| 4/2/2021 | Signed up for one time prescription and then received a second and they wouldn't refund my money. Don't use Rex MD. |
| 3/29/2021 | Horrible customer service. Appears to be on the edge of being fraudulent DONT BUY ANYTHING FROM THIS COMPANY Took 30 days to get a reply and then only excuses Never received what I ordered Had to go to my credit card and file fraudulent report to get my money back. |
| 3/26/2021 | Thought I'd save some money & take advantage of a Groupon and try RexMD. BIG MISTAKE. Not only did it take a eight days to get the script I was bothered, daily, by erroneous texts telling me to call due to a problem with my order that didn't exist. Finally got my order AND IT WAS THE WRONG SCRIPT! Won't be using again! |
| 3/14/2021 | They don't know how to stop re-occurring payments after you tell them to stop they cost me a overcharge with my bank |
| 3/13/2021 | They did not process my cancellation from December. Forced me to take another delivery. No answer on customer service number. Received email stating they can't stop order even though their tracking number hasn't showed up on USPS. |
| 3/7/2021 | Although they are not legally bound by HIPAA regulations since they don't take insurances, beware they will call your phone and start asking about the medications you have or may consider purchasing from them to whoever answers the phone. Definately a violation of privacy. I won't be using this company! |

| 3/4/2021 | They will con you and say one time , then charge you saying you signed up for monthly subscriptions .will not refund and will not. clear the issue, you have to dispute and cancel your card "they do fraudulent charges till you finally check your acct." |
|---|---|
| 3/2/2021 | they make it extremely difficult to cancel your subscription ! beware... they say you can go online and cancel but that's not true. you are forced to call the information line- they are keeping my credit card information etc. |

Investors may claim that the majority of reviews are positive, yet we note that reviews are extremely easy to game. For example, one female hair loss blogger has noted Amazon comments that allege Shapiro MD has offered a year of product in exchange for favorable reviews. One Amazon review even states explicitly that "I'm leaving a review so I can get more free product." We further note that many customers may post positive reviews initially upon receiving product, yet are unaware that they have also been enrolled in an autoshipping program. We think that a business whose core strength is built upon customer deception is unsustainable.

## LifeMD CEO Justin Schreiber is a Career-Long Stock Promoter

We believe the practices at LifeMD are set from the top down. To that end, investors ought to realize that CEO Justin Schreiber is a career-long stock promoter. He's apparently attempted to omit this sordid history from investors, but we lay it bare below. We think LifeMD mirrors these past schemes, Schreiber can't be trusted, and LFMD is uninvestible. Schreiber's core entity is JLS Ventures, which claims to "leverage deep capital markets experience and relationships to catalyze portfolio company growth." JLS's website also claims to have "175 employees and growing" and "12 current portfolio companies." We think this 175-employee figure is also totally contrived from thin air; JLS appears to basically be a holding company for Justin Schreiber, and JLS's LinkedIn profile shows just 3 employees, Schreiber being one of them:

JLS Ventures classifies itself as investment management company, but its donut producing acumen puts Krispy Kreme to shame. Just as for the case with LifeMD, we think it's likely that Schreiber has inflated JLS's credentials. Not only that, but Schreiber again omits the Company's failures, as an archived version of the website lists several logos which have since been removed:

Culper Research                     LifeMD, Inc. (NASDAQ:LFMD)                     April 14, 2021



In our view, these logo removals suggest that JLS wishes to distance itself from the subsequent blow-ups that Schreiber arguably aided and abetted. In July 2014, Advaxis, an immunotherapy company, paid JLS $4 million in stock for "investor relations services."



Clean Coal Technologies was another spectacular blow-up in which President Douglas Hague was arrested by the DOJ and charged with kickbacks to a third party who bought Clean Coal's restricted stock at inflated prices:



Oxis touted a cancer drug before imploding and renaming itself GT Biopharma (GTBP):



Finally, in February 2014, JLS owned Cardax (OTC:CDXI) through common stock and warrants which it received in exchange for "consulting services":



## At LifeMD, Insiders Win While Common Shareholders Lose

Despite the Company's torrential cash burn, insiders have collected healthy paychecks. From 2019 to 2020, G&A expenses (separate from selling and marketing expenses) went from $2.4 million to $42.2 million. Footnotes indicate that stock-based compensation for the year was an astounding $37.0 million, almost matching the Company's $37.3 million in total revenues. This sheer level of insider enrichment concerns us, given Schreiber's propensity to participate in stock promotion schemes in which common shareholders are left holding the bag.

Stock awards aside, insiders have enriched themselves via related-party transactions. For example, LifeMD pays BV Global Fulfillment, apparently owned by Justin Schreiber's father Brian, both monthly fees and "direct costs" associated with shipping Company product:



LifeMD's Form 10-K indicates that its Puerto Rico offices – consisting of just 1,000 square feet – were leased from JLS Ventures (Justin Schreiber's entity) with annual rent payments of $52,000 in 2019 and $45,000 in 2020. At $45 per square foot, we estimate LFMD is paying Schreiber 2x to 3x comparable market rents. See Class A space available here at $21/sqft, an office park here at $18/sqft, suburban space here at $12/sqft, and finally here at $18/sqft. In effect, Schreiber and his cronies appear willing to grift shareholders by any means possible.

The Company's 2019 Form 10-K also indicates that JLS Ventures earned an astounding 900,000 shares for providing credit card processing services to the Company, yet these disclosures have been removed in the Company's 2020 Form 10-K. We remain unclear as to whether this was due to a change in service providers or if LifeMD is merely once again selectively disclosing negative information to investors.

Perhaps these questions were the same ones asked by LFMD's auditors, which tally 4 in the past 5 years, or CFO's, of which there have been 3 since March 2019. CFO Juan Manual Pinero Dagnery departed most recently in April 2021, while each auditor has expressed going concern warnings for LFMD:

| Year | Firm Name | Audit Partner | Location |
| --- | --- | --- | --- |
| 2016 | PKF O'Connor Davies, LLP | George Arthur Whitehead | New York, NY |
| 2017 | Rosenberg Rich Baker Berman, P.A. | Daniel Arnold Brown | Somerset, NJ |
| 2018 | B F Borgers CPA PC | Ben F Borgers | Lakewood, CO |
| 2019 | B F Borgers CPA PC | Ben F Borgers | Lakewood, CO |
| 2020 | Freidman LLP | Justin Van Fleet | Marlton, NJ |

It's worthwhile to note that ex-CFO Dagnery resigned from the Company just a single day after his second tranche of options vested, suggesting that he was looking to "take his money and run." See per his original employment contract that Dagnery received a package by which 166,667 options would vest on April 1 each year:

> "Subject to the Employee remaining an employee of the Company, the Options shall vest in three equal installments. For the avoidance of doubt, 166,667 options shall vest on April 1, 2020, 166,667 options shall vest on April 1, 2021, and 166,666 options shall vest on April 1, 2022."

In his departure agreement, the Company explicitly noted that he would be paid out:

> "Options: The time-based option to purchase 166,667 (33,333.4 shares post 5-for-1 reverse stock split) of common stock of LifeMD at an exercise price of $0.23 ($1.15 post 5-for-1 reverse stock split) held by you on the Termination Date that are scheduled to vest on April 1, 2021 will be deemed vested and not subject to forfeiture as of the Termination Date."

## Appendix: LifeMD Has Hidden Past Involvement in Redwood Scientific

### CEO Schreiber was Redwood's Formation Agent and a Significant Shareholder

Puerto Rico's corporate registry indicates that Schreiber himself was Redwood's Resident Agent and Incorporator. Redwood also lists addresses at 53 Palmeras Street ("The Caribe Office Building"), 8th Floor. This address is shared by LFMD's Puerto Rico subsidiaries:

### General Information

| Name | REDWOOD SCIENTIFICTECHNOLOGIES PR INC. | | |
|---|---|---|---|
| Register No. | 369671 | Status | CANCELLED |
| Formation Date | 09-Mar-2016 4:31 PM | Effective Date | 09-Mar-2016 4:31 PM |
| Expiration Date | Does not expire | Termination Date | 21-Dec-2018 12:01 AM |
| Class | Corporation | | |
| Type | For Profit | Jurisdiction | Domestic |

### Designated Office Address

| Street Address | Caribe Office Building, 8th Floor 53 Palmeras Street SAN JUAN, PR 00901 | Mailing Address | Caribe Office Building, 8th Floor 53 Palmeras Street SAN JUAN, PR 00901 |
|---|---|---|---|

### Resident Agent

| Name | Schreiber, Justin L | | |
|---|---|---|---|
| Street Address | Caribe Office Building, 8th Floor 53 Palmeras Street SAN JUAN, PR 00901 | Mailing Address | Caribe Office Building, 8th Floor 53 Palmeras Street SAN JUAN, PR 00901 |

### Officers

| Name / Title(s) | Street Address | Mailing Address |
|---|---|---|
| Cardiff, Jason (President) | Caribe Office Building, 8th Floor, 53 Palmeras Street, SAN JUAN, PR, 00901 | Caribe Office Building, 8th Floor, 53 Palmeras Street, SAN JUAN, PR, 00901 |

### Incorporators

| Name | Street Address | Mailing Address |
|---|---|---|
| Schreiber, Justin L | Caribe Office Building, 8th Floor, 53 Palmeras Street, SAN JUAN, PR, 00901 | Caribe Office Building, 8th Floor, 53 Palmeras Street, SAN JUAN, PR, 00901 |

### Stocks

| Class | Number | Par Value |
|---|---|---|
| Common | 1,000 | $1.00 |

### Purpose

Company develops and markets FDA registered over the counter drugs that address unmet needs.

Culper Research         LifeMD, Inc. (NASDAQ:LFMD)         April 14, 2021

In Redwood's Form S-1 filed in 2016, significant shareholders include an entity named "JP Global" located at the same address – 53 Calle Palmeras Street:

(38) Consists of 114,689 Shares of Common Stock, 105,000 Shares of Common Stock underlying Series A Warrants and 1,599 Shares of Common Stock underlying additional warrants due to anti-dilution provisions of the Bridge Notes. The person having voting, dispositive or investment power over JP Global is Georgianne Ocasio. The address for JP Global is 53 Calle Palmeras 8th Floor, San Juan, Puerto Rico, 00901.

The footnote states that Georgianna Ocasio has voting power over JP Global, while Ocasio's LinkedIn profile states that from January 2014 to December 2017, she was Director of JLS Ventures, LLC, of which Justin Schreiber is founder and president:



We think this to be a thinly-veiled layer over Schreiber's involvement, none of which has been disclosed to current LifeMD investors.

## Former CFO Pinero Dagnery (February 2021) was a Significant Redwood Shareholder

We also find that former LifeMD CFO was a significant Redwood shareholder through "802 Investments LLC" which was also located at the Caribe Office Building:

| Name of Selling Stockholder | Number of Shares of Common Stock Owned Prior to Offering(1) | Maximum Number of Shares of Common Stock to be Sold Pursuant to this Prospectus (2) | Number of Shares of Common Stock Owned After Offering (3) |
|---|---|---|---|
| 802 Investments LLC (4) | 165,668 | 165,668 | 0 |

(4) Consists of 110,445 Shares of Common Stock and 55,223 Shares of Common Stock underlying Series B Warrants. The person having voting, dispositive or investment power over 802 Investments LLC is Juan M. Pinero Dagnery. The address for 802 Investments LLC is 53 Calle Palmeras Ste 802, San Juan, Puerto Rico, 00901.

Culper Research                    LifeMD, Inc. (NASDAQ:LFMD)                    April 14, 2021

## Former CFO Kalkstein (March 2019) was a Significant Redwood Shareholder

The same goes for former LifeMD CFO Robert Kalkstein, who owned shares through "Generous Limestone LLC", also located at the Caribe Office Building:

(23) Consists of 27,460 Shares of Common Stock and 25,000 Shares of Common Stock underlying Series A Warrants and 380 Shares of Common Stock underlying additional warrants due to anti-dilution provisions of the Bridge Notes. The person having voting, dispositive or investment power over Generous Limestone LLC is Robert Kalkstein. The address for Generous Limestone LLC is 53 Calle Palmeras 6th Floor, San Juan, Puerto Rico, 00901.