UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO. 20-23527-CV-WILLIAMS

RICHARD MAURICE BUSH,

      Plaintiff,

v.

BLINK CHARGING COMPANY, *et al.*,

      Defendants.

_____/

## OMNIBUS ORDER

**THIS MATTER** is before the Court on Defendants', Blink Charging Co. ("***Blink***"), Michael D. Farkas ("***Farkas***") and Michael P. Rama ("***Rama***," or collectively with Blink and Farkas, "***Defendants***"), Motion to Dismiss Lead Plaintiffs', Tianyou Wu ("***Wu***"), Alexander Yu ("***Yu***"), and H. Marc Joseph ("***Joseph***," or with Wu and Yu, "***Plaintiffs***" or "***Lead Plaintiffs***"), Amended Complaint  (DE 47) ("***Motion to Dismiss***"). Plaintiffs filed a Response in Opposition to the Motion to Dismiss (DE 48), to which Defendants filed a Reply (DE 54). For the reasons set forth below, the Motion to Dismiss (DE 47) is **GRANTED IN PART AND DENIED IN PART**.

### I.      BACKGROUND

Defendant Blink is an owner, operator, and provider of electric vehicle ("***EV***") charging equipment and networked charging services. (DE 40 at 9.) Blink offers both residential and commercial EV charging equipment. (*Id.*) At the time of the filing of this lawsuit, Mr. Farkas was Blink's Founder, Executive Chairman, Chief Executive Officer and largest shareholder. (*Id.*) Mr. Rama has held the position of Blink's Chief Financial Officer since February 2020. (*Id.*) Plaintiffs consist of a class of individuals and entities

who purchased or otherwise acquired Blink securities between March 6, 2020 and August 19, 2020 ("**Class Period**"). (*Id.* at 1.) This action arises from Defendants' allegedly false and misleading statements and omissions concerning the size and functionality of Blink's EV charging station network. (*Id.* at 2.)

### A.   *Blink's allegedly false and misleading statements.*

Throughout the Class Period, in press releases, marketing materials, and public filings with the SEC, Defendants promoted Blink's deployment of over 15,000 charging stations at which EV drivers can "easily charge." (*Id.* at 2.) Specifically, Blink made the following statements:

On March 6, 2020, Blink issued a press release stating, in relevant part:

> Blink Charging . . . is a leader in electric [sic] (EV) charging equipment and networked EV charging stations, **enabling EV drivers to easily charge at any of its 15,000 charging station[s]** (this is a correction to our press release from March 5, 2020 where we inadvertently referred to our 23,000 deployed charging stations since we began our business) . . . .

(*Id.* at 26.)

On March 17, 2020, Blink issued another press release stating, in relevant part, that "it is a leader in electric vehicle (EV) charging equipment and networked EV charging stations, **enabling EV drivers to easily charge at any of its 15,000 charging [stations]**." (*Id.*)

On April 2, 2020, Blink filed its Form 10-K with the SEC, signed by both Mr. Farkas and Mr. Rama ("**2019 Annual Report**"), which stated:

> As of December 31, 2019, we had 14,778 charging stations deployed, of which 5,199 were Level 2 commercial charging units, 104 were DC Fast Charging EV chargers and 1,200 were residential charging units in service

on the Blink Network. Additionally, as of December 31, 2019, we had 353 Level 2 commercial charging units on other networks and there were also 7,922 non-networked, residential Blink EV charging stations. The non-networked, residential Blink EV charging stations are all host owned. In total, over the years the Company has deployed a total of 23,795 in North America (including units that were replaced, removed, discarded, etc.). In addition, the Company's subsidiary in Greece (Blink Charging Hellas SA) has deployed 23 charging stations in Greece (46 plugs) and about to deploy 4 Level 3 (DCFC) units in the first quarter of 2020, while the wholly owned subsidiary in Israel (Blink Charging Ltd.) deployed 17 charging stations (24 plugs) in Israel.

(*Id.* at 27.) The 2019 Annual Report also stated:

As of December 31, 2019, the Company has sold or deployed a total of approximately 14,778 charging units, of which, 5,199 were Level 2 commercial charging units, 104 were DC fast charging units and 1,200 were residential charging units. Included in the above total number are approximately 353 Level 2 units deployed on other networks and 7,922 non-networked, residential charging units.

(*Id.*)

On May 13, 2020, Blink filed its Form 10-Q with the SEC for Blink's first quarter of 2020, signed by both Mr. Farkas and Mr. Rama ("*1Q 2020 10-Q*"), which stated:

As of March 31, 2020, the Company had 14,643 charging stations deployed, of which, 5,283 were Level 2 commercial charging units, 103 were DC Fast Charging EV chargers and 1,070 were residential charging units. Additionally, as of March 31, 2020, we had 342 Level 2 commercial charging units on other networks and there were also 7,845 non-networked, residential Blink EV charging stations.

(*Id.* at 28.) The 1Q 2020 10-Q also stated:

At March 31, 2020, we have sold or deployed a total of approximately 14,643 charging units, of which, 5,283 were level 2 commercial charging units, 103 were DC Fast Charging EV units and 1,070 were residential charging units. Included in the above total number are approximately 342 Level 2 units deployed on other networks and 7,845 non-networked, residential charging units.

(*Id.*)

On July 8, 2020, in an interview with Yahoo Finance, Defendant Farkas differentiated Blink from its competitors by stating, "But we decided as an owner and an operator of charging stations, to make sure that we spend our money and put in the ground, we're not going to have to deal with obsolescence." (*Id.* at 29 (citing Yahoo Finance, Blink CEO Michael Farkas Joins on The Move with Julie Hyman and Rick Newman, YOUTUBE (July 8, 2020), https://www.youtube.com/watch?v=N0O7LIaEghw).)

On August 13, 2020, Blink filed its second quarter 2020 Form 10-Q ("*2Q 2020 10-Q*") with the SEC, signed by Mr. Farkas and Mr. Rama, which stated: "As of June 30, 2020, the Company had 15,151 charging stations deployed, of which, 5,385 were Level 2 commercial charging units, 102 were DC Fast Charging EV chargers and 1,193 were residential charging units. Additionally, as of June 30, 2020, the Company had 305 Level 2 commercial charging units on other networks and there were also 8,166 non-networked, residential Blink EV charging stations." (*Id.*)

Finally, on August 17, 2020, Blink wrote on its Twitter and Facebook accounts: "Blink's network of over 15,000 chargers gives EV drivers the ability to charge their car wherever they live, work, and play." (*Id.* at 30.)

## B.  *The Culper Report.*

Plaintiffs allege that "[t]he market learned the truth about Blink's charging station network on August 19, 2020, when analyst Culper Research published a blistering report entitled 'Blink Charging Co. (BLNK): You Won't Miss It'" ("*Culper Report*"). (*Id.* at 6.) Culper Research, the website that published the Culper Report, is run by an anonymous

individual.[1] (DE 47 at 13.) According to Defendants, the anonymous individual behind Culper Research admitted he or she had "shorted" Blink's stock and, therefore, "stood to gain by a decline in its stock price." (*Id.* at 11.)

The Culper report stated that Blink vastly exaggerated the size and functionality of its EV charging network. (DE 40 at 6.) The Culper Report explained that Blink offers a live map that specifies individual addresses and locations of its EV charging stations on its network. (*Id.*) During Culper's investigation, Blink's live map revealed 3,275 total chargers. (*Id.*) Culper's investigators conducted visits to 242 stations at eighty-eight locations across the U.S., which revealed "neglected, abused, non-functional, or otherwise missing chargers." (*Id.*) Of the select locations included in the Culper Report, a charging site in San Diego, California had numerous EV chargers with non-functional screens and a charging site in Kennesaw, Georgia had a single charging cord piped outside of an industrial door with no screen or instructions to assist EV drivers with charging their vehicle. (*Id.* at 15–16.) Excluding the non-functional or publicly inaccessible chargers, the Culper Report concluded that the network consists of only 2,192 chargers. (*Id.* at 7.) After the Culper Report was published, Blink's stock price fell from its August 18, 2020 closing price of $10.23 per share to an August 20, 2020 closing price of $7.94 per share. (*Id.*)

---

[1] Defendants allege: "Other than a website address (www.culperresearch.com), there is no information about 'Culper Research.' The website does not list a physical address, email address, or telephone number. Nor does the website list the names of any persons working there or any indication about its size." (DE 47 at 11.)

### C. *The confidential witnesses.*

Plaintiffs obtained statements from three (3) confidential witnesses ("*CWs*"), who are former employees at Blink. (*Id.* at 16.) CW-1 worked at Blink as a Regional Sales Lead for Southern California from January to April 2020. (*Id.*) CW-1 stated that most of the publicly available Blink charging stations he encountered were outdated, had not been serviced, were broken, didn't have proper signage, or were generally neglected. (*Id.*) CW-1 stated that Blink's municipal customers, e.g., Long Beach and San Diego, were frustrated because Blink repeatedly declined to repair old and broken chargers, which led to Blink getting "shut out of these contracts" and the municipalities instead contracting with Blink's competitors. (*Id.* at 20–21.) CW-1 said Blink's upper management, including Farkas, "had to know" about getting shut out of the municipal contracts due to their value, but that "they did not try to do anything to fix the issue." (*Id.* at 21.) Additionally, CW-1 stated that he participated in weekly sales call with Blink's senior management, including Farkas, where the issue of "decrepit/non-functioning" charging stations had been discussed. (*Id.* at 22.) Senior management, including Farkas, were also informed of these issues through regular regional sales reports. (*Id.* at 23.)

CW-2 was a Marketing Coordinator at Blink from June 2019 to April 2020 stationed in Miami, Florida. (*Id.* at 23.) CW-2 stated that "emphasizing Blink's supposed fleet of 15,000 charging stations in the marketing was paramount," but CW-2 did not personally know how Blink arrived at that number. (*Id.* at 24.) CW-2 shared that all charging stations would show up on Blink's public map regardless of "whether they've been running or they stopped running two years ago," but Blink's internal maps revealed any problems with the public charging units. (*Id.*) CW-2 said that Blink's image was

"tarnished" by older units in the field and critics would speak up about this issue on Blink's social media pages. (*Id.*) CW-2 stated that the marketing team—including his supervisor, Rebecca Gutierrez, who reported directly to Farkas—spent "significant time" responding to customer queries and complaints. (*Id.* at 25.)

CW-3 was a Regional Sales Representative stationed in Pennsylvania for Blink's mid-Atlantic region from July 2019 to February 2020. (*Id.*) CW-3 participated in weekly sales calls in which Farkas regularly participated and asked questions. (*Id.*) "One issue that frequently came up on th[o]se calls was the reputational damage Blink suffered due to non-functioning and dilapidated charging stations out in the field, and that complaints made on social media platforms and other forums were not being addressed in a timely way." (*Id.* at 25–26.)

### D. *Procedural history.*

On February 19, 2021, Plaintiffs filed their Amended Complaint, the operative Complaint in this matter[2] (DE 40) ("***Amended Complaint***"). Plaintiffs' Amended Complaint alleges violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("***Exchange Act***"), and U.S. Securities and Exchange Commission ("***SEC***") Rule 10b-5 ("***Rule 10b-5***"). (*Id.*) Count one for violation of Section 10(b) of the Exchange Act

---

[2] Plaintiff Richard M. Bush filed his original complaint against Defendants on August 24, 2020. (DE 1.) On September 1, 2020, Plaintiff Gina Vittoria filed a similar complaint in another matter. *See Vittoria v. Blink Charging Co., et al.*, No. 20-cv-23643-KMW (S.D. Fla. Sept. 1, 2020). On September 30, 2020, the Parties filed a Motion to Consolidate (DE 14), which the Court granted (DE 18). After Chief Magistrate Judge Edwin G. Torres appointed Wu, Yu, and Joseph as Lead Plaintiffs (DE 29), the Court ordered Plaintiffs to file an Amended Complaint (DE 30).

and Rule 10b-5 is against all Defendants and count two for violation of Section 20(a) of the Exchange Act is against only Defendants Farkas and Rama. (*Id.*)

On April 20, 2021, Defendants filed the Motion to Dismiss presently before the Court. (DE 47.) In their Motion to Dismiss, Defendants argue that Plaintiffs' evidence does not bear the necessary indicia of reliability to support a securities fraud claim; the Amended Complaint does not adequately allege that Blink's statements were false or misleading; Defendants did not have a duty to disclose additional information about the functionality of its network; the Amended Complaint fails to allege facts giving rise to a strong inference of scienter; and the Amended Complaint fails to adequately plead loss causation. (*Id.*)[3]

---

[3] On September 19, 2023, Plaintiffs filed a Request for Judicial Notice of Document in Connection with Defendants' Motion to Dismiss (DE 61) ("***Request for Judicial Notice***"). In the Request for Judicial Notice, Plaintiffs ask the Court to take judicial notice of Blink's Quarterly Report on Form 10-Q for the period ending June 30, 2023, filed with the SEC on August 9, 2023. (*Id.*) Plaintiffs argue that the disclosure "bears on issues raised in Defendants' motion to dismiss, including the elements of falsity, materiality and scienter." Defendants object to the request as improper because, not only does the disclosure reveal "nothing more" than the existence of an SEC investigation (DE 62 at 3 (quoting *Meyer v. Greene*, 710 F.3d 1189, 1201 (11th Cir. 2013))), but the disclosure was filed with the SEC nearly three years *after* Plaintiffs filed their Amended Complaint. (*Id.* at 3–4.) The Court agrees. *See City of Los Angeles v. Bankrate, Inc.*, 2015 WL 11438106, at *4 (S.D. Fla. Nov. 23, 2015) ("Although a district court may take judicial notice of public records and other documents at the Rule 12(b)(6) stage, such as the SEC filings and other documents cited in the Complaint, a court should not consider public records dated after a complaint is filed and submitted by a plaintiff in an attempt to bolster or amend a complaint . . . . Although the Court could speculate as to how Plaintiff may wish to use the information in those documents to supplement its allegations, the proper vehicle to use such information is through an amended complaint, not in opposition to a motion a dismiss."). Accordingly, the Request for Judicial Notice (DE 61) is **DENIED**.

## II.     LEGAL STANDARD

Complaints alleging securities fraud are subject to a "triple-layered pleading standard." *Carvelli v. Ocwen Fin. Corp.*, 934 F.3d 1307, 1317 (11th Cir. 2019). To survive a motion to dismiss, a securities-fraud claim brought under Rule 10b–5 must satisfy the run-of-the-mill federal notice-pleading requirements under Federal Rule of Civil Procedure 8(a)(2), the heightened pleading standards found in Federal Rule of Civil Procedure 9(b), and the special fraud pleading requirements imposed by the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u–4 ("**PSLRA**"). *Id.* at 1317–18.

Under the federal notice-pleading requirements, a complaint must plead sufficient facts to state a claim that is "plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The court must accept factual allegations as true and draw reasonable inferences in the plaintiff's favor. *See Speaker v. U.S. Dept. of Health and Human Servs. Ctrs. for Disease Control and Prevention*, 623 F.3d 1371, 1379 (11th Cir. 2010). While Federal Rule of Civil Procedure 8(a)(2) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief," the complaint must include "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555). "[A] formulaic recitation of the elements of a cause of action will not do." *Id.* Rule 12(b)(6) does not allow dismissal of a claim because the court anticipates "actual proof of those facts is impossible"; however, the "[f]actual allegations must be enough to raise a right of relief above the speculative level." *Watts v. Fla. Int'l Univ.*, 495 F.3d 1289, 1295 (11th Cir. 2007) (quoting *Twombly*, 550 U.S. at 545).

Complaints sounding in fraud must also comply with the heightened pleading standard outlined in Rule 9(b). Plaintiffs must "allege specifically (1) which statements or omission were made in which documents or oral representations; (2) when, where, and by whom the statements were made (or in the case of omissions, not made); (3) the content of the statements or omissions and how they were misleading; and (4) what the defendant received as a result of the fraud." *Carvelli*, 934 F.3d at 1317–18 (citing *FindWhat Inv. Grp. v. FindWhat.com*, 658 F.3d 1282, 1296 (11th Cir. 2011)).

The PSLRA imposes additional heightened pleading requirements for private securities actions. The PSLRA requires a complaint to "specify each statement alleged to have been misleading" and "the reason or reasons why the statement is misleading." *FindWhat*, 658 F.3d at 1296 (quoting 15 U.S.C. § 78u–4(b)(1)). "If an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." *Id.* (quoting 15 U.S.C. at § 78u–4(b)(1)). With respect to each act or omission, the complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind [i.e., scienter]." *Id.* (quoting 15 U.S.C. at § 78u–4(b)(2)).

## III.    DISCUSSION

Plaintiffs assert two claims under the Securities Exchange Act of 1934 in their Amended Complaint, alleging that Defendants inflated the price of their stock through multiple allegedly false statements. Defendants move to dismiss Plaintiffs' Amended Complaint for failure to state a claim under either Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder or Section 20(a) of the Exchange Act. (DE 47.)

### A. *Section 10(b) and Rule 10b-5.*

To state a claim under Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder, a complaint must allege (1) a material misrepresentation or omission; (2) scienter; (3) a connection with the purchase or sale of a security; (4) reliance; (5) damages; and (6) loss causation. *FindWhat*, 658 F.3d at 1295 (citations omitted). Defendants challenge the falsity, scienter, and loss causation elements of Plaintiffs' claim.

The Exchange Act prohibits "literally false statements" and "any omissions of material fact 'necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.'" *Id.* at 1305 (quoting 17 C.F.R. § 240.10b–5(b)). "A securities fraud plaintiff has the burden of showing an alleged misstatement was material." *Luczak v. Nat'l Beverage Corp.*, 812 F. App'x 915, 924 (11th Cir. 2020) (citation omitted). "A misrepresentation or omission is material if, 'in the light of the facts existing at the time,' a 'reasonable investor, in the exercise of due care, would have been misled by it.'" *Carvelli*, 934 F.3d at 1317 (quoting *FindWhat*, 658 F.3d at 1305). The materiality requirement "depends on the specific circumstances of each case, including the totality of information available to investors." *Id.* (citing *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44, (2011)). It "aims to strike a balance between protecting investors and allowing companies to distribute information without perpetual fear of liability—in essence, to ensure that not every minor misstatement provides litigation fodder for disgruntled investors." *Id.*

Page **11** of **26**

Actions under Section 10(b) and Rule 10b-5 "require a showing of either an 'intent to deceive, manipulate, or defraud,' or 'severe recklessness.'"[4] *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1284 (11th Cir. 1999). This is referred to as "scienter." A plaintiff cannot plead scienter generally. Rather, for each alleged misrepresentation or omission, a plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Richard Thorpe & Darrel Weisheit v. Walter Inv. Mgmt., Corp.*, 111 F. Supp. 3d 1336, 1352 (S.D. Fla. 2015). Additionally, a plaintiff must allege "loss causation," which requires "'proof of a causal connection between the misrepresentation and the investment's subsequent decline in value.'" *Meyer v. Greene*, 710 F.3d 1189, 1195 (11th Cir. 2013) (quoting *Robbins v. Koger Props., Inc.*, 116 F.3d 1441, 1448 (11th Cir. 1997)); *see* 15 U.S.C. § 78u-4(b)(4) ("[T]he plaintiff shall have the burden of proving that the act or omission of the defendant alleged to violate this chapter caused the loss[.]"). "The plaintiff must show that the defendant's fraud was the proximate cause of the alleged loss." *Luczak*, 812 F. App'x at 920 (citing *FindWhat*, 658 F.3d at 1309); *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 342 (2005) (explaining that loss causation analysis resembles common law tort causation due to the common law roots of securities fraud actions). However, a plaintiff need not show that the defendant's

---

[4] The Eleventh Circuit has characterized "severe recklessness" as:

> [L]imited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it.

*Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1282 n.18 (11th Cir. 1999).

fraud was the "sole and exclusive cause of his injury; he need only show that the defendant's act was a substantial or significant contributing cause." *Id.* (citing *FindWhat*, 658 F.3d at 1309).

Plaintiffs contend that Defendants materially misrepresented the size and functionality of the Blink Network. (DE 40 at 2.) Defendants stated in multiple press releases and filings with the SEC that their network consisted of around 15,000 chargers. (*Id.*) But Plaintiffs argue that this figure was a material misrepresentation because it included non-networked, inaccessible, neglected, non-functional, or otherwise missing chargers, and the true size of the network was 15% of Blink's representations. (*Id.*) The Court first addresses Defendants' alleged misrepresentations regarding the size of the network and then their statements regarding the functionality of the network.

### 1. Size.

Plaintiffs allege that Defendants made multiple, materially false and misleading statements regarding the size of Blink's network: the March 2020 press statements, the SEC filings, and social media (Twitter and Facebook) marketing statements. Defendants repeatedly advertised their network consisting of approximately 15,000 charging stations, yet Plaintiffs claim the total amount of chargers available to the public "was nearly 7x smaller than represented (i.e., 2,192 chargers)."[5] (*Id.* at 4.) Defendants reject this

---

[5] Plaintiffs do not argue that Defendants had not actually deployed 15,000 charging stations. Rather Plaintiffs maintain that this characterization is a material misrepresentation given that only 15% of those 15,000 chargers were publicly available. (*See* DE 40 at 13–16.) As such, *Brody v. Zix Corp.*, 2006 WL 2739352 (N.D. Tex. Sept. 26, 2006), the case Plaintiffs rely on to support their position that Blink overstated the size of its network, is distinguishable. (*See* DE 48 at 15.) In *Brody*, a medical device company boasted that the company had deployed their device in over 500 physicians' officers when

characterization, arguing that Plaintiffs are conflating the total number of chargers deployed and the number of publicly available chargers. (DE 47 at 14–15.) And, as demonstrated by Defendants, the complete "numerical breakdown," which classified the deployed charging stations, was available at all relevant times. (*Id.*) Thus, Defendants argue that Blink's statements regarding the size of the Blink network were not material misrepresentations. (*Id.* at 16.) The Court agrees.

In determining whether statements are material misrepresentations, "the Court must examine the[] representations in context and consider the total mix of available information." *Mich. Carpenters' Pension Fund v. Rayonier Advanced Materials, Inc.*, 2019 WL 1429667, at *21 (M.D. Fla. Mar. 29, 2019). Relevant here are the following representations regarding the size of Blink's network: (1) Blink's SEC Form 10-Q filed before the class period (DE 47-5),[6] which contains a full breakdown of the deployed chargers; (2) the March press statements made at the start of the class period, which advertise Blink's 15,000 charging stations and do not have any breakdown of deployed chargers; (3) the three SEC filings within the class period, which each contain a breakdown of the deployed chargers; and (4) Blink's social media statements made towards the end of the class period, which advertise Blink's 15,000 charging stations and

---

it had only deployed 100 of its devices at the time that statement was made. 2006 WL 2739352 at *1–4. Where defendant's statement in *Brody* that it had deployed 500 devices was actually false—overrepresenting the size of its deployed devices by 500%—Blink's statement that it had deployed 15,000 was not. As of the date of the Class Period, Blink had actually deployed approximately 15,000 charging stations; however, not all of these stations were available publicly.

[6] "[A] court, when considering a motion to dismiss in a securities fraud case, may take judicial notice (for the purpose of determining what statements the documents contain and not to prove the truth of the documents' contents) of relevant public documents required to be filed with the SEC, and actually filed." *Bryant*, 187 F.3d at 1278.

do not have any breakdown of deployed chargers. Given that before and during the Class Period Blink had publicly filed the accurate breakdown of its chargers, Plaintiffs' claim pertaining to the misrepresentation of the *size* of the Blink network fails.

Blink made at least four public disclosures with the SEC containing the accurate breakdown of its charging network: the Form 10-Q filed on November 13, 2019; the 2019 Annual Report filed on April 2, 2020; the 1Q 2020 10-Q filed on May 13, 2020, and the 2Q 2020 10-Q filed on August 13, 2020. Each filing contained a numerical breakdown indicating which of its chargers were public and which were privately owned and not accessible to the public. For example, the 2019 Annual Report stated:

> As of December 31, 2019, we had 14,778 charging stations deployed, of which 5,199 were Level 2 commercial charging units, 104 were DC Fast Charging EV chargers and 1,200 were residential charging units in service on the Blink Network. Additionally, as of December 31, 2019, we had 353 Level 2 commercial charging units on other networks and there were also 7,922 non-networked, residential Blink EV charging stations. The non-networked, residential Blink EV charging stations are all host owned. In total, over the years the Company has deployed a total of 23,795 in North America (including units that were replaced, removed, discarded, etc.).

(DE 40 at 27.)[7] Again, Plaintiffs allege that these statements were materially false and misleading because Blink's "functional public charging station network consisted of approximately 2,200 charging stations. Defendants misled investors by misrepresenting and/or failing to disclose that many of [Blink's] public charging stations shown on Blink's live map were non-existent . . . or inaccessible." (*Id.* at 29.) However, as noted by Defendants, Blink not only disclosed the number of deployed chargers, but also "provided

---

[7] For sake of clarity, the Court refers only to the numbers reported in 2019 Annual Report throughout this subsection. However, the Court acknowledges that the numbers vary slightly between the four SEC filings.

a numerical breakdown . . . by category and connectivity to the Blink Network." (DE 47 at 15.) Specifically, the breakdown indicated how many chargers were residential and/or not connected to the Blink network. (*Id.*) In other words, the statements reflect the internal breakdown of the numbers of chargers on and off the network, and when added together, add up to the total number of chargers Blink said it had deployed.[8]

Plaintiffs' arguments in opposition to the Motion to Dismiss are not persuasive. Plaintiffs argue that Defendants "cleverly" use the word "additionally" in the SEC filings to make it seem like the 353 other network and 7,922 non-network residential chargers were additional chargers to the 14,778 total chargers deployed. However, as noted above, when read (and added) together, the numbers reported in the SEC filings add up to the number of total chargers deployed. A close reading demonstrates that the breakdown before the word "additionally" (5,199 + 104 + 1,200) includes the network chargers, and the breakdown after the word "additionally" (353 + 7,922) includes the non-network and other network chargers. Adding the network and non-network/other network breakdown together totals 14,778, the total number of chargers Blink represented it had deployed to date. Assuming, *arguendo*, that the Court was persuaded by Plaintiffs' argument that the word "additionally" was misleading, the argument is undermined by the fact that the 2019 Annual Report, the 1Q 2020 10-Q, and the pre-Class Period Form 10-Q filed on November 13, 2019 contain clarifying language within each report that the non-

---

[8] 5,199 (network commercial charging units) + 104 (network fast charging units) + 1,200 (network residential units) + 353 (other network units) + 7,922 (non-network residential units) = 14,778 total charging stations deployed. The breakdown shows that only 6,503 of the 14,778 units were connected to the Blink network, and that 1,200 of the 6,503 were residential (i.e., non-public) units. (DE 47 at 16.)

network/other network breakdown is "[i]ncluded in the above total number."[9] (DE 40 at 27–28.)

In summary, given that there is no allegation that Blink had not actually deployed 15,000 charging stations and Blink provided the numerical breakdown of the charging stations in its SEC filings, Plaintiffs' claim regarding Defendants' alleged misrepresentations of the size of the Blink networks fails. Even though the March press statements and social media statements simply state that the company has 15,000 charging stations, the breakdown of chargers by category was publicly available in the SEC filings at all relevant times. *See Mich. Carpenters' Pension Fund*, 2019 WL 1429667, at \*21 ("The statements identified by Plaintiffs would be misleading only if they 'conveyed to the public a false impression' . . . . Significantly, the Court must examine these representations in context and consider the total mix of available information.") (citations omitted); *cf. Bryant*, 187 F.3d at 1278 (11th Cir. 1999) ("SEC filings are generally recognized as the most accurate and authoritative source of public information about a company."). Any reasonable investor who viewed the total mix of publicly available information would not be misled about the size of the Blink network. *See Carvelli*, 934 F.3d at 1317; *cf. Selbst v. Coca-Cola Co.*, 262 F. App'x. 177, 179 (11th Cir. 2008) (affirming that SEC disclosures in the relevant time period can refute plaintiff's allegations

---

[9] The fact that the 2Q 2020 10-Q does not contain this clarifying language does not change the outcome of the Court's analysis because, in determining materiality of a statement, the Court must look at the totality of the information available. *See Carvelli*, 934 F.3d at 1317 (citing *Matrixx Initiatives*, 563 U.S. at 44). And, again, the SEC report filed a few months before the Class Period and two of the three SEC reports published during the Class Period contained this language. (*See* DE 40 at 27–28.)

of securities fraud). Thus, in light of all the information available to a prospective investor, none of Blink's statements regarding the size of its network were misleading.

### 2. Functionality.

#### a. Falsity.

Plaintiffs allege that Defendants made multiple materially false and misleading statements regarding the functionality of Blink's network. Plaintiffs argue that "Blink's network was filled with neglected, abused, non-functional, or otherwise missing chargers," despite Defendants constantly promoting their vast EV charging network throughout the Class Period. (DE 40 at 4.) Defendants argue that they made no material misrepresentation regarding the functionality of the Blink network because they "never represented or guaranteed that all charging stations ever sold, whether on the Blink Network or not, were in perfect working order and functioning at all times." (DE 47 at 18–19.) Additionally, Defendants maintain that they had no "duty to disclose to investors the operating status of some 6,500 chargers and the location and functionality of each charger." (*Id.* at 19.) The Court finds that Defendants' arguments oversimplify the issue and are not persuasive.

When viewed in the light most favorable to Plaintiffs, the Court finds that Plaintiffs have sufficiently alleged that Defendants materially misrepresented the functionality of their network. As alleged by Plaintiffs, Defendants touted Blink's EV charging network and repeatedly shared how many chargers were publicly accessible, but Defendants omitted that a significant percentage of the network was not functional.[10] While the Court

---

[10] In addition to Defendants' statements regarding the functionality of charging stations deployed, Plaintiffs also argue that Farkas' statement on YouTube regarding

agrees with Defendants that not every "slip up and misstep . . . within a touted sales program" must be disclosed to investors, *see Henningsen v. ADT Corp.*, 161 F. Supp. 3d 1161, 1197 (S.D. Fla. 2015), Defendants have an obligation to "neutralize . . . the natural and normal implication of [their] statements." *FindWhat*, 658 F.3d at 1298–99, 1305 (finding that defendants' "affirmative statements of present fact" triggered a duty to disclose the grave defects that existed within the enforcement system they voluntarily touted) (internal quotations and citations omitted). Surely a "natural implication" of Defendants promoting the number of chargers Blink had deployed and stating that consumers can "easily" charge at "any" of the charging stations is that those charging stations will, by and large, work. However, if Blink faced a functionality issue as severe, pervasive, and "systemic" as alleged by Plaintiffs, then Defendants would have had the

---

obsolescence is materially misleading as to the operational status of the network. (DE 40 at 29.) But Defendants argue that Plaintiffs took Farkas' statement out of context:

> When viewed in the proper context, it is clear that Mr. Farkas' use of the term "obsolescence" does not relate to whether a charger is functional; rather, it refers to whether a charger is likely to become outdated (*i.e.*, obsolescent) as a result of advances in EV charging technology.

(DE 54 at 8–9.) Additionally, Defendants argue that this statement is mere puffery. (*Id.* at 9 n.20.) The Court agrees with Defendants that this statement is a statement of corporate optimism rather than a material misstatement. *Carvelli*, 934 F.3d at 1318–19 ("Puffery comprises generalized, vague, nonquantifiable statements of corporate optimism."); *Brody*, 2006 WL 2739352, at *3 ("Broad, generalized statements considered 'puffery' are not actionable under Section 10(b) and Rule 10b-5."). A reasonable person would not rely on a technology CEO's statement that his business will not become obsolete as fact. *See In re Royal Cruises Ltd. Secs. Litig.*, 2013 WL 3295951, at *12 (S.D. Fla. April 19, 2013) (holding that statements regarding "healthy demands," an "intention to compete successfully," and the "'encouraging' prospect of early bookings" were mere puffery); *see also ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 206 (2d Cir. 2009) (finding that defendant's statements regarding its "highly disciplined" risk management were puffery and "too general to cause a reasonable investor to rely upon them").

duty to disclose such issues. *See Henningsen*, 161 F. Supp. 3d at 1182 ("By voluntarily revealing one fact about its operations, a duty arises for the corporation to disclose such other facts, if any, as are necessary to ensure that what was revealed is not 'so incomplete as to mislead.'") (quoting *FindWhat*, 658 F.3d at 1305). And certainly, a reasonable person would find it important and relevant if a substantial number of Blink's charging stations were not functioning at a given time. *See SEC v. Merch. Capital, LLC*, 483 F.3d 747, 766 (11th Cir. 2007) ("The test for materiality in the securities fraud context is whether a reasonable man would attach importance to the fact misrepresented or omitted in determining his course of action.") (internal quotations omitted). Because Defendants failed to disclose any issues regarding functionality, Plaintiffs have sufficiently alleged a material omission regarding the functionality of Blink's network. *See id.*; *see also No. 84 Emp.-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 935 (9th Cir. 2003) (finding that defendant's statements painting a rosy picture of financial prospects were a material omission because, at the time of the statements, the defendant airline knew it had not disclosed specific problems, including maintenance issues and an FAA investigation).

### b. Scienter.

Having adequately alleged a material misrepresentation or omission, Plaintiffs must allege scienter with respect to each Defendant and with respect to each alleged violation of the statute (i.e., each material misrepresentation or omission). Here, there are multiple separate statements alleged to have been misleading as to the functionality of Blink's charging stations: the March press statements, the SEC filings, and the August social media statements. *See Phillips v. Scientific-Atlanta, Inc.*, 374 F.3d 1015, 1017–18

(11th Cir. 2004). Notably, the Court does not have to infer scienter from individual facts alone. Rather, scienter can be inferred from an aggregation of particularized facts. *Id.* at 1017.

In the Amended Complaint, Plaintiffs allege with particularity multiple facts supporting the strong inference of scienter. Specifically, CW-1 stated that Blink's municipal customers, e.g., Long Beach and San Diego, were frustrated because Blink repeatedly declined to repair old and broken chargers, which led to Blink getting "shut out of these contracts" and the municipalities instead contracting with Blink's competitors. (DE 40 at 20–21.) CW-1 said Blink's upper management, including Farkas, "had to know" about getting shut out of the municipal contracts due to their value and through receiving regular regional sales reports. (*Id.* at 21, 23.) Additionally, CW-1 stated that he participated in weekly sales call with Blink's senior management, including Farkas, where the issue of "decrepit/non-functioning" charging stations had been discussed. (*Id.* at 22.) CW-2 shared that all charging stations would show up on Blink's public map regardless of "whether they've been running or they stopped running two years ago," but Blink's internal maps revealed any problems with the public charging units. (*Id.* at 24.) CW-3 attested to participating in weekly sales calls in which Farkas regularly attended when upper management would frequently address the reputational damage Blink suffered due to non-functioning and dilapidated charging stations out in the field, and that complaints made on social media platforms and other forums were not being addressed in a timely way." (*Id.* at 25–26.) In sum, when assessing scienter, a reviewing court must ask: when the allegations are accepted as true and taken collectively, would a reasonable person

deem the inference of scienter at least as strong as an opposing inference?[11]  *FindWhat*, 658 F.3d at 1300 (citing *Mizzaro*, 544 F.3d at 1239).  Here, the Court affirmatively answers this question and finds that the allegations, when viewed "holistically," "weigh in favor of a finding that Defendant[s] [] acted with scienter." *Richard Thorpe & Darrel Weisheit*, 111 F. Supp. 3d at 1359, 1374 ("[T]he Court finds that the allegations that Defendant Corey knew and had access to materials contradicting the Company's public statements weigh in favor of a finding that Defendant Corey acted with scienter.").

### c.  Loss Causation.

Plaintiffs allege that they suffered significant losses and damages as a result of Defendants' wrongful acts and omissions that led to the precipitous decline in the market value of the Company's securities. (DE 40 at 7.) Upon publication of the Culper Report on August 19, 2020, Plaintiffs contend that Blink's stock price fell approximately 22.4% from the August 18, 2020 closing price of $10.23 per share to the August 20, 2020 closing price of $7.94 per share, decreasing Blink's market capitalization by $72 million.  (*Id.*)

In a "fraud-on-the-market case,"[12] plaintiffs commonly demonstrate loss causation circumstantially, by identifying a "corrective disclosure" and "showing that the stock price

---

[11] This question is not the same as the standard employed for summary judgment under Federal Rule of Civil Procedure 56, because it asks what a reasonable person *would* think, not what a reasonable person *could* think. *Mizzaro*, 544 F.3d at 1239 (citations omitted).

[12] In "fraud-on-the-market" cases, a plaintiff's claim is generally not that the initial investment transaction would not have occurred at all without a fraudulent misrepresentation, but only that it would have occurred at a different price. *FindWhat*, 658 F.3d at 1310. Because an informationally efficient market processes and prices all available information into the stock's value, publicly available information premised on falsity or incomplete information also is priced into the stock's value. *Id.* As such, the

dropped soon after the corrective disclosure." *FindWhat*, 658 F.3d at 1311 ("[L]oss causation requires proof that the fraud-induced inflation that was baked into the plaintiff's purchase price was subsequently removed from the stock's price, thereby causing losses to the plaintiff."). To sufficiently plead loss causation, plaintiffs must also "eliminat[e] other possible explanations for this price drop, so that the factfinder can infer that is more probable than not that it was the corrective disclosure—as opposed to other possible depressive factors—that caused at least a 'substantial' amount of the price to drop." *Id.* at 1312.

Plaintiffs identified the Culper Report as the "corrective disclosure," uncovering Defendants' omissions on the functionality of Blink's EV chargers. Because corrective disclosures must publicly reveal new facts to the market, Plaintiffs must allege that the Culper Report did more than simply report information already known by the market or previously reported in public filings. *Meyer v. Greene*, 710 F.3d 1189, 1197–99 (11th Cir. 2013) (discussing that the mere repackaging of already-public information by an analyst or short-seller is insufficient to constitute a corrective disclosure). Here, Plaintiffs sufficiently allege that the Culper Report discloses new information, comprising direct findings from its independent investigation into the accessibility and functionality of Blink's EV charging stations at select locations across the United States. *See id.* Specifically,

---

stock's market price will include an artificial inflationary value—the amount that the market mistakenly attributes to the stock based on the misleading or fraudulent misinformation. *Id.* So long as the misleading information remains uncorrected, "it will continue to taint the total mix of available public information, and the market will continue to attribute the artificial inflation to the stock." *Id.* at 1310. When the misinformation is corrected by the release of truthful information, otherwise known as the "corrective disclosure," the market will recalibrate the stock price to account for the newly uncovered, truthful information, thus eliminating the artificial value it had attributed to the price. *Id.* at 1310–11.

Plaintiffs allege that the Culper Report disclosed the purported truthful information that 16.1% of Blink's EV charging stations were damaged or non-functional. (DE 40 at 6.)

Applying the information disclosed in the Culper Report and construing all reasonable inferences in the light most favorable to Plaintiffs, among Blink's 5,303 non-residential, network chargers, 854 are purportedly non-functional. As such, Plaintiffs sufficiently allege the Culper Report as a proper "corrective disclosure." Moreover, as a consequence of this disclosure, Plaintiffs sufficiently pled loss causation in light of the allegation that Blink's stock price subsequently dropped 22.4% over a two-day span immediately following the Culper Report's publication. *See Hartel v. GEO Group, Inc.,* 2021 WL 4397841, at *13 (S.D. Fla. Sept. 23, 2021) (finding that a two-day drop in a Company's share price immediately following the publication of false or misleading statements constitutes a sufficient pleading of loss causation).

Having determined Plaintiffs adequately pled the substantive securities violations against Defendant Blink, the Court turns to the secondary liability claim against Farkas and Rama.

### B. *Section 20(a).*

Under Section 20(a) of the Exchange Act, a "controlling person" is "liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable." 15 U.S.C. § 78t(a). "[A] defendant is liable as a controlling person under [S]ection 20(a) if he or she had the power to control the general affairs of the entity primarily liable at the time the entity violated the securities laws and had the requisite power to directly or indirectly control or influence the specific corporate policy which resulted in the primary liability." *Brown v. Enstar Grp., Inc.,* 84 F.3d 393, 396

(11th Cir. 1996) (internal quotations and citation omitted). The viability of a Section 20(a) claim is dependent on the successful pleading of a primary violation under Section 10(b) of the Exchange Act. *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1237 (11th Cir. 2008) ("Because a primary violation of the securities laws is an essential element of a § 20(a) derivative claim, we have held that a plaintiff adequately pleads a § 20(a) claim only if the primary violation is adequately pleaded.").

Plaintiffs have sufficiently alleged that Farkas and Rama, "[b]y virtue of their high-level positions," participated in or were aware of Blink's false and misleading statements, "and had the power to influence and control and did influence and control," the decision-making of Blink, including the content and dissemination of the various statements subject of this dispute. (DE 40 at 41.) As further claimed by Plaintiffs, Farkas and Rama were provided with or had unlimited access to copies of Blink's allegedly misleading "reports, press releases, public filings, and other statements . . . prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected." (*Id.*) Likewise, Plaintiffs contend that Farkas and Rama "had direct and supervisory involvement in the day-to-day operations of [Blink] and, therefore, had the power to control or influence the particular statements giving rise to the" alleged securities violations. (*Id.*) Accordingly, and in light of the fact that Plaintiffs have "adequately pled primary violations under the Securities and Exchange Act," the Court will not dismiss Plaintiffs' claim against Farkas and Rama pursuant to Section 20(a) of the Act. *In re PSS World Med., Inc. Sec. Litig.*, 250 F. Supp. 2d 1335, 1351 (M.D. Fla. 2002) (citing *Brown*, 84 F.3d at 396–97).

## IV.    CONCLUSION

For the foregoing reasons, it is **ORDERED AND ADJUDGED** as follows:

1. Defendants' Motion to Dismiss (DE 47) is **GRANTED IN PART AND DENIED IN PART**.

2. Plaintiffs' Request for Judicial Notice (DE 61) is **DENIED**.

3. Defendants shall file an answer to Plaintiffs' Amended Complaint within fourteen (14) days of the date of this Order.

4. The Parties shall <u>jointly</u> file a joint conference report and proposed scheduling order within fourteen (14) days of the date of this Order.

**DONE AND ORDERED** in Chambers in Miami, Florida, this <u>27th</u> day of November, 2023.

KATHLEEN M. WILLIAMS
UNITED STATES DISTRICT JUDGE