**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**Case No. 20-23527-Civ-WILLIAMS/TORRES**

RICHARD M. BUSH, Individually and
On Behalf of All Others Similarly Situated,

Plaintiff,

v.

BLINK CHARGING COMPANY,
MICHAEL D. FARKAS, and
MICHAEL P. RAMA,

Defendants.

**DEFENDANTS' ANSWER AND AFFIRMATIVE DEFENSES**
**TO PLAINTIFFS' CONSOLIDATED AMENDED COMPLAINT**

Defendants Blink Charging Co. ("Blink"), Michael D. Farkas, and Michael P. Rama

respond to each paragraph of Plaintiff's Consolidated Amended Complaint for Violation of the

Federal Securities Laws (the "Complaint") as follows:

**ANSWER**

**GENERAL DENIAL**

Defendants deny any allegations or averments in the headings, unnumbered paragraphs,

and "wherefore" clauses of the Complaint to the extent any response is required.

## I.  NATURE AND SUMMARY OF THE ACTION

1.  This securities class action arises from Defendants' false and misleading statements and omissions concerning the size and functionality of Blink's electric vehicle ("EV") charging station network, allowing Defendants to siphon money from the pockets of investors to corporate insiders.  Throughout the Class Period, in press releases and marketing materials, Defendants repeatedly promoted Blink's deployment of over 15,000 chargers at which EV drivers can "easily charge." In addition, Defendants frequently touted the advanced technical features of Blink's charging units, claiming the Company "designed Blink equipment to combat planned obsolesce common with other EV equipment, thereby reducing the need

for future upgrades as electric vehicle battery technology improves." In truth, the Company's public charging station network consists of just 2,192 stations—a scant 15% of Blink's representations. And, in direct conflict with Defendants' claims that Blink's chargers were high-tech and in high demand, Blink's public charging station network was littered with obsolete and inoperable chargers, which the Company refused to service or replace. The utterly decrepit condition of Blink's public charging stations resulted in a multitude of customer complaints, reduced revenue growth, missed sales, and damaged brand recognition. Defendants' misrepresentations about the number and functionality of Blink's EV charging station network inflated the price of Blink's common stock, until research firm Culper Research published a report, claiming the Company had overstated the size of its charger network and that Blink had let many of its chargers fall into disrepair because the Company lacked the cash and manpower to maintain its equipment, causing the stock price to plummet.

**ANSWER:** Defendants deny the allegations in paragraph 1.

2. Blink, through its wholly-owned subsidiaries, owns, operates and provides EV charging equipment and networked charging services. The Company offers both residential and commercial EV charging equipment, enabling EV drivers to recharge at various location types. Blink's principal line of products and services are the Blink EV charging network (the "Blink Network"); EV charging equipment (also known as electric vehicle supply equipment); and EV related services. Blink common stock trades on the NASDAQ stock exchange under the ticker "BLNK." The Company is headquartered in Miami Beach, Florida.

**ANSWER:** Defendants admit the allegations in paragraph 2.

3. Charging infrastructure forms a critical component for EV demand as it addresses range anxiety, one of the major barriers to large scale adoption of EVs. With EVs set to appear more frequently on the streets, they will need to recharge somewhere, including in times where the driver is far away from home. Throughout the Class Period, Defendants elicited significant investor enthusiasm by continuously touting the size of Blink's EV charging network, which would enable the Company to generate recurring revenue. Specifically, Blink repeatedly issued press releases and marketing materials touting its "network of over 15,000 chargers [which] gives EV drivers the ability to charge their car wherever they live, work, and play." Similarly, in a promotional interview, Defendant Farkas played up the size of Blink's charging network, claiming that Blink is "the largest, from a scale size. There are some smaller [network operators] who have a smaller amount of locations, but we're in a lot more areas."[1]

---

[1] TD Ameritrade Network, Blink CEO Michael Farkas on The Watchlist, YOUTUBE (July 8, 2020), https://www.youtube.com/watch?v=8MOtPc-jaBg.

**ANSWER:**. Defendants deny the allegations in paragraph 3 and refer to the text of the document and the video of the interview referenced in that paragraph for the complete and actual description of their content.

4.      Defendants also touted the quality and functionality of Blink's charging stations. For example in a July 8, 2020 interview with Yahoo Finance, Defendant Michael D. Farkas differentiated Blink from its competitors by stating, "But we decided as an owner and an operator of charging stations, to make sure that we spend our money and put in the ground, we're not going to have to deal with obsolescence."[2]

**ANSWER:** Defendants deny the allegations in paragraph 4 and refer to the text of the document referenced in that paragraph for the complete and actual description of its content.

5.      Defendants' representations concerning the size and functionality of Blink's electric vehicle charging station network impressed securities analysts. Indeed, throughout the Class Period analysts at HC Wainwright repeatedly noted that "the company's Blink Network, with over 14,000 charging locations, offers the company a competitive advantage."[3]

**ANSWER:** Defendants deny the allegations in paragraph 5 and refer to the text of the document referenced in that paragraph for the complete and actual description of its content.

6.      Defendants' representations were also well-received by investors, as Blink's stock price spiked over 400% during the Class Period, reaching a high of $14.58 per share on July 30, 2020.

**ANSWER:** Defendants deny the allegations in paragraph 6, except admit that Blink's highest stock price on July 30, 2020 was $14.58 per share.

7.      In reality, Defendants had grossly overstated the size of Blink's EV charging network. While Blink claimed to have deployed over 15,000 chargers, the Company's true functional public network was nearly 7x smaller than represented (i.e., 2,192 chargers). Moreover, in clear conflict with Defendants' statements about the high quality and state of the art features of Blink's charging stations, Blink's

[2] Yahoo Finance, Blink CEO Michael Farkas Joins On The Move with Julie Hyman and Rick Newman, YOUTUBE (July 8, 2020), https://www.youtube.com/watch?v=N0O7LIaEghw.
[3] *See* "Geographical Diversity Augurs Well Despite Near-Term COVID-10 Headwinds; 4Q19 Results Overview," H.C. Wainwright & Co. (Apr. 6, 2020); "International Expansion Continues; 1Q20 Results Overview," H.C. Wainwright & Co. (May 18, 2020); "Joint Venture With Car-Sharing Service Provider Expands Reach; Reiterate Buy," Wainwright & Co. (June 12, 2020).

3

network was filled with neglected, abused, non-functional, or otherwise missing chargers.

**ANSWER:** Defendants deny the allegations in paragraph 7.

8.      According to well-placed, reliable former Blink employees with personal knowledge of the subject matter, decrepit and inoperable stations were "systemic," impacting over 90% of the Southern California region. These former Blink employees stated that the problem was so widespread that Blink was being inundated with customer complaints of damaged and/or non-functional chargers. However, not wanting to spend money to address these problems, and because rehabbing or replacing existing stations would not be logged as a new sale, Defendants made the conscious decision to ignore these customer complaints. These former Blink employees further confirmed that Blink's decision to neglect its decrepit and inoperable chargers created major customer relation issues, significant missed sales opportunities, considerable loss of market share, and a big hit to Blink's brand image.

**ANSWER:** Defendants deny the allegations in paragraph 8, except Defendants are without knowledge and information sufficient to form a belief as to the truth of the allegations attributed to "former Blink employees" and therefore deny same.

9.      Defendants knew throughout the entirety of the Class Period of the sad state of Blink's public charging network. Blink's sales representatives frequently raised the issue of the decrepit condition of Blink's public charging stations and how they were causing serious sales execution issues on weekly sales calls, on which Blink's highest-level executives participated, including Defendant Farkas. Defendants were also informed of the issue in regular regional sales reports from Blink sales representatives. Defendants further knew of the issue through Blink's internal mapping database, which allowed Defendants to view the condition of Blink's charging stations in real-time. Indeed, Defendant Farkas has publicly spoken about the capabilities of Blink's internal mapping system, stating, "Our [Blink's] charging stations are network-connected, we're able to ping them and see what kind of status they're in, send people over there."[4]

**ANSWER:** Defendants deny the allegations in paragraph 9 and refer to the video of the interview referenced in that paragraph for the complete and actual description of its content.

10.      Defendants' scheme has allowed Blink insiders to line their pockets at the expense of investors. For example, Defendant Farkas' total compensation, including stock awards, totaled $6.5 million from 2016 to 2019, equivalent to more than half the

---

[4] JMac Investing, Exclusive One-On-One Interview with Blink Charging CEO Michael D. Farkas, YOUTUBE (Aug. 25, 2020), https://www.youtube.com/watch?v=v4KUgfml2Q4.

4

company's revenue. Included in Defendant Farkas's 2018 compensation were $394,466 in commissions to Farkas Group Inc., a third-party entity he controlled that Blink hired to install chargers.

**ANSWER:** Defendants deny the allegations in paragraph 10, except admit that Farkas received compensation for his services to the Company and that Farkas Group, Inc. is or was a company controlled by Farkas relating to the installation of chargers and a placement fee, which received $394,466 in commissions in 2018.

11. The market learned the truth about Blink's charging station network on August 19, 2020, when analyst Culper Research published a blistering report entitled "Blink Charging Co. (BLNK): You Won't Miss It" (the "Culper Report"). The Culper Report states, in relevant part:

> [W]e believe that [Blink] has vastly exaggerated the size of its EV charging network in order to siphon money from the pockets of investors to insiders. Blink claims that "EV drivers can easily charge at any of its 15,000 charging stations," but we estimate that the Company's functional public charging station network consists of just 2,192 stations, a mere 15% of this claim.

**ANSWER:** Defendants deny the allegations in paragraph 11.

12. The Culper Report explained that Blink offers a live map that specifies individual addresses and locations of its EV charging stations on its network. During Culper's investigation, Blink's own live map revealed just 3,275 total chargers. Culper's investigators conducted "on the- ground visits to 242 stations at 88 locations across the U.S. [which] revealed a plethora of neglected, abused, non-functional, or otherwise missing chargers."

**ANSWER:** Defendants deny the allegations in paragraph 12.

13. Of the 242 stations its investigators visited in the Atlanta, Chicago, Miami, and San Diego metro areas, in 23 instances (9.5% of total), Blink's map indicated that there were EV chargers on site, but Culper's investigators were either unable to locate the chargers or locate all of the chargers claimed. In 39 instances (16.1% of total), Culper's investigators "found chargers that, even though they existed, were visibly damaged and/or non-functional," and that "[a]s many of these chargers have been left to the elements for close to a decade, the most common deformities were due to sun and heat damage." Furthermore, in another 18 instances (7.4% of total), Culper's investigators "found that chargers were inaccessible to the general public," and that "[m]any of these were behind locked garages, or restricted only for employee (in office buildings) or resident (in condo or apartment buildings) use only." Culper concluded: ***"In short, our sampling suggests that of the 3,275***

> *chargers listed on the Company's map, only 67% of these, or 2,192 exist, are* ***functional, and are publicly accessible.*** *(Emphasis in original.)* ***"In sum, Blink*** ***vastly overstates the size [and] functionality . . . of its chargers."*** *(Emphasis* *added.)*

**ANSWER:** Defendants deny the allegations in paragraph 13.

14.     On this news, Blink's stock price fell from its August 18, 2020 closing price of $10.23 per share to an August 20, 2020 closing price of $7.94 per share. This represents a two day drop of approximately 22.4%, erasing over $72 million in market capitalization.



**ANSWER:** Defendants deny the allegations in paragraph 14, except admit that the Company's

stock price declined.

15.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiffs and other Class members have suffered significant losses and damages.

**ANSWER:** Defendants deny the allegations in paragraph 15.

## II.     JURISDICTION AND VENUE

16.     The federal law claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. § 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5, as well as under the common law.

**ANSWER:** Defendants deny the allegations in paragraph 16, except admit that Plaintiffs have filed claims under the Securities Exchange Act of 1934 and the rules promulgated thereunder. Defendants deny that Plaintiffs have valid claims.

17.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

**ANSWER:** Defendants admit the allegations in paragraph 17.

18.     This Court has jurisdiction over each Defendant named herein because each Defendant is an individual or corporation who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the District Court permissible under traditional notions of fair play and substantial justice.

**ANSWER:** Defendants admit the allegations in paragraph 18.

19.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1931(b), as the Company has its principal executive offices located in this District and conducts substantial business here.

**ANSWER:** Defendants admit the allegations in paragraph 19.

20.     In connection with the acts, omissions, conduct and other wrongs in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to the U.S. mail, interstate telephone communications and the facilities of the national securities exchange.

**ANSWER:** Defendants deny the allegations in paragraph 20.

### III.    PARTIES

21.     Plaintiffs, as set forth in their previously filed Certifications,[5] acquired Blink securities at artificially inflated prices during the Class Period and were damaged upon the revelation of the alleged corrective disclosures.

**ANSWER:** Defendants deny the allegations in paragraph 21, except Defendants are without knowledge and information sufficient to form a belief as to the truth of the allegations regarding Plaintiffs' acquisition of Blink's securities and therefore deny same.

22.     Defendant Blink is an "owner, operator, and provider of electric vehicle ('EV') charging equipment and networked charging services. Blink offers both residential

---

[5] ECF Nos. 22-1, 24-2.

7

and commercial EV charging equipment, enabling EV drivers to easily recharge at various location types." Blink common stock trades in an efficient market on the NASDAQ stock exchange under the ticker "BLNK." The Company's headquarters are located at 407 Lincoln Road, Suite 704, Miami Beach, FL 33139, and the Company is incorporated under the laws of the State of Nevada.

**ANSWER:** Defendants admit the allegations in paragraph 22.

23.     Defendant Michael D. Farkas ("Farkas") is Blink's Founder, Executive Chairman, and Chief Executive Officer ("CEO") at all relevant times. As of December 31, 2019, Farkas owned 25.1% of Blink's common stock and wields control over Blink.

**ANSWER:** Defendants deny the allegations in paragraph 23, except admit that Farkas served as the Company's Executive Chairman from May 2015 to May 2023 and as CEO from 2010 to July 2015 and from October 2018 to May 2023.

24.     Defendant Michael P. Rama ("Rama") is Blink's Chief Financial Officer, having served in that capacity since February 10, 2020. He previously acted as an "independent financial consultant" for Blink since July 2019.

**ANSWER:** Defendants deny the allegations in paragraph 24, except admit that Rama has served as the Company's CFO since February 10, 2020.

25.     Collectively, Defendants Farkas and Rama are referred to throughout this complaint as the "Individual Defendants," and the Individual Defendants and Blink are "Defendants."

**ANSWER:** Defendants admit the allegations in paragraph 25.

26.     The Individual Defendants, because of their positions at the Company, possessed the power and authority to control the content and form of the Company's annual reports, quarterly reports, press releases, investor presentations, and other materials provided to the SEC, securities analysts, money and portfolio managers and investors, i.e., the market. The Individual Defendants authorized the publication of the documents, presentations, and materials alleged herein to be misleading prior to its issuance and had the ability and opportunity to prevent the issuance of these false statements or to cause them to be corrected. Because of their position with the Company and access to material non-public information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were false and misleading. The Individual Defendants are liable for the false statements pleaded herein.

**ANSWER:** Defendants deny the allegations in paragraph 26, except admit that the Individual Defendants possessed the power and authority to control the content and form of the Company's annual reports, quarterly reports, press releases, investor presentations, and other materials provided to the SEC, securities analysts, money and portfolio managers and investors, i.e., the market.

### IV.   SUBSTANTIVE ALLEGATIONS

**A.   Blink's Background and Business**

27.   Blink is an owner, operator, and provider of EV charging equipment and networked charging services. Blink's origin traces back to 2006 when it formed shell company "New Image Concepts, Inc." to provide "top-drawer" personal consulting services related to grooming, wardrobe and entertainment. In December 2009, the Company became known as Car Charging Group, Inc. and then changed its name again to Blink Charging Co. in 2017.

**ANSWER:** Defendants admit the allegations in paragraph 27.

28.   Defendant Farkas joined the Company as CEO in 2010, after working as a stockbroker and serving as "principal shareholder" of Skyway Communications Holding Corp., a company which the SEC deemed a "pump-and-dump scheme" during the years Farkas held shares and was allegedly involved in drug trafficking. In 2013, Defendant Farkas oversaw Car Charging's $3.3 million purchase of bankrupt ECOtality, Inc. ("ECOtality") which had received more than $100 million in U.S. Department of Energy grants to install chargers nationwide.

**ANSWER:** Defendants deny the allegations except admit that Farkas joined the Company in 2010 and oversaw Car Charging's $3.3 million purchase of ECOtality.

29.   Blink's core network assets remain to this day those acquired from bankrupt company ECOtality in 2013. Blink acquired 12,350 Level 2 commercial charging stations, 110 fast-charging stations, and a network supporting them.

**ANSWER:** Defendants deny the allegations in paragraph 29, except admit that Blink acquired charging stations from ECOtality.

30.   Blink offers both residential and commercial charging equipment, enabling EV drivers to recharge at various location types. These location types include airports, auto dealers, healthcare/medical, hotels, mixed-use, municipal locations, multifamily residential and condos, parks and recreation areas, parking lots,

religious institutions, restaurants, retailers, schools and universities, stadiums, supermarkets, transportation hubs, and workplace locations.

**ANSWER:** Defendants admit the allegations in paragraph 30.

31. One of Blink's principal line of products and services is the Blink Network, a proprietary cloud-based system that operates, maintains, and tracks Blink charging stations and their associated charging data, including back-end operations and payment processing. ***The Blink Network provides property owners, managers and parking companies ("Property Partners") with cloud-based services that enable the remote monitoring and management of EV charging stations, payment processing, and provides EV drivers with vital charging station information including charging station location, availability, and applicable fees.***

**ANSWER:** Defendants admit the allegations in paragraph 31.

32. Blink offers Property Partners a range of business models for EV charging equipment and services that generally fall into one of four business models. In all of these business models, Blink provides connectivity of the charging station to the Blink Network:

- In Blink's comprehensive turnkey business model, the Company owns and operates the EV charging station, undertake and manages the installation, maintenance and related services, and keeps substantially all of the EV charging revenue.

- In Blink's hybrid business model, the Property Partner incurs the installation costs, while the Company provides the charging equipment. Blinks owns, operates and manages the EV charging station and provides connectivity of the charging station to the Blink Network. Blink shares a greater portion of the EV charging revenue with the Property Partner than under the turnkey model above. This is Blink's most common business model.

- In Blink's host-owned business model, the Property Partner purchases, owns and manages the Blink EV charging station, incurs the installation costs of the equipment, while Blink provides site recommendations, connectivity to the Blink Network, payment processing, and optional maintenance services, while the Property Partner keeps substantially all of the EV charging revenue.

- In the Company's Blink-as-a-service model, Blink owns and operates the EV charging station, while the Property Partner incurs the installation cost. Blink operates and manages the

> EV charging station and the Property Partner pays Blink a fixed monthly fee and keeps all the charging revenues less network connectivity and processing fees.

**ANSWER:** Defendants admit the allegations in paragraph 32.

33.     Blink's historical financial performance leaves much to be desired. Blink's revenue is meager, totaling approximately $2.75 million in 2019. The Company has never posted an annual profit in its 11-year history. In addition, in a May 2020 filing, Blink warned investors that its finances "raise substantial doubt about the Company's ability to continue as a going concern within a year," a required disclosure when a company does not have enough cash on hand for 18 months of expenses.

**ANSWER:** Defendants deny the allegations in paragraph 33 and refer to the text of the document referenced in that paragraph for the complete and actual description of its content.

34.     Blink's financial reporting is also wanting.  Throughout the Class Period, Blink admitted to material weaknesses in its internal controls over financial reporting, specifically *"related to lack of (i) formalized controls and procedures required to ensure that information necessary to properly record transactions is adequately communicated on a timely basis from nonfinancial personnel to those responsible for financial reporting, (ii) segregation of duties in our accounting function, and (iii) monitoring of our internal controls."*

**ANSWER:** Defendants deny the allegations in paragraph 34 and refer to the text of the document referenced in that paragraph for the complete and actual description of its content**.**

35.     Blink's weak financial performance and reporting has not deterred insiders from collecting healthy paychecks. Since 2014, the Company has expended over $44 million in cash, while total compensation has also summed to $44 million. Defendant Farkas has been the greatest beneficiary of the Company's outlandish executive compensation. Defendant Farkas's total compensation, including stock awards, totaled $6.5 million from 2016 to 2019, equivalent to more than half the company's revenue during this period. Included in his 2018 compensation were $394,466 in commissions to Farkas Group Inc., a third-party entity he controlled that Blink hired to install chargers.

**ANSWER:** Defendants deny the allegations in paragraph 35, except admit that Farkas received compensation for his services to the Company and that Farkas Group, Inc. is or was a company controlled by Farkas relating to the installation of chargers and a placement fee, which received $394,466 in commissions in 2018.

36.    Blink has been plagued by significant executive turnover, with three of five Board members departing between November 2018 and November 2019. This includes Board member Kevin Evans, who resigned under the following circumstances: "To the knowledge of the Company's executives and Board members, Mr. Evans resigned due to a failure to find common ground with the Executive Chairman [Michael Farkas]." The Company has had two chief financial officers and three chief operating officers since 2017. And, as explained below, one former COO, James Christodoulou ("Christodoulou"), who was fired in March 2020, sued the company, accusing it of potential securities violations. Significantly, Christodoulou reached a settlement with Blink for $400,000 in October 2020.[6]

**ANSWER:** Defendants deny the allegations in paragraph 36 and refer to the text of the document referenced in that paragraph for the complete and actual description of its content, except admit that Evans resigned in December 2016, the Company has had two CFOs and three COOs since 2017, and that Christodoulou was terminated for cause in March 2020 for willful misconduct stemming from violations of the Company's employment policies, sued the Company, and reached a settlement for $400,000 in October 2020.

**B.    Blink's Purported Competitive Advantage**

37.    Blink's primary competitor is ChargePoint, Inc. ("ChargePoint") with over 26,000 charging stations at the beginning of the Class Period. Blink and ChargePoint both sell equipment and help service their respective networks, but only Blink actually owns and operates their own stations in many instances.

**ANSWER:** Defendants deny the allegations in paragraph 37.

38.    When asked during a Q2 2020 earning conference call on August 13, 2020 what differentiates the Blink model from some of the Company's competitors, Defendant Farkas stated: "Because we own the charging stations . . . we make them a little bit better . . . because we want them to last longer, because that's our model. . . . [W]e've designed this hardware for our own use. For us to own and operate in the field . . . and *hav[e] a tremendous amount of robust data that we could share with EV, host and owners."*

**ANSWER:** Defendants deny the allegations in paragraph 38 and refer to the text of the document referenced in that paragraph for the complete and actual description of its content.

---

[6] See Blink Charging Co., Quarterly Report (Form 10-Q) (Nov. 13, 2020) at p. 22.

**C.**   **Blink Overstated Its Available Charging Stations on the Blink Network**

39.   Throughout the Class Period, Blink made false and misleading statements about the number of charging stations on the Blink Network that exist, are functional, and are publicly accessible.

**ANSWER:** Defendants deny the allegations in paragraph 39.

40.   As detailed in the Culper Report, Blink claims to have 15,151 charging stations deployed as of June 30, 2020. Over 8,000 of the purported 15,000 charging stations at which "EV drivers can easily charge" are non-networked residential stations, meaning they are purely private.  Blink implies that the remainder are on Blink's Network.

**ANSWER:** Defendants deny the allegations in paragraph 40, except admit that during the purported Class Period Blink had over 15,000 charging stations deployed.

41.   During Culper's investigation, Blink's online live map – which specifies individual addresses and locations of Blink's charging stations, real-time charger status, and the number of EV chargers by type – showed just 3,275 chargers available for public use.



**ANSWER:** Defendants deny the allegations in paragraph 41.

42.   Culper's investigators visited 242 chargers at 88 locations across the U.S., using the details offered on Blink's live map. But many of the 242 chargers were missing (9.5%),nonfunctional (16.1%) or inaccessible (7.4%). Consolidated data from Culper's site visits is shown in the table below:

| Metro Area | Locations Visited | Chargers Listed | Chargers Found | Chargers Operational | Chargers Accessible |
|---|---|---|---|---|---|
| Atlanta | 27 | 62 | 57 | 46 | 39 |
| Chicago | 5 | 8 | 5 | 3 | 2 |
| Miami* | 29 | 65 | 60 | 55 | 45 |
| San Diego | 27 | 107 | 97 | 76 | 76 |
| Total | 88 | 242 | 219 | 180 | 162 |
| % of Total | | 100.0% | 90.5% | 74.4% | 66.9% |

*these figures exclude 30+ chargers at the Miami Beach Convention center, which were entirely inaccessible due to on-site COVID testing.*

**ANSWER:** Defendants are without knowledge and information sufficient to form a belief as to the truth of the allegations in paragraph 42 and therefore deny same**.**

43. Accordingly, Culper's sampling suggests that of the 3,275 available chargers listed on Blink's map, only 67% of these, or 2,192, exist, are functional, and are publicly accessible.

**ANSWER:** Defendants are without knowledge and information sufficient to form a belief as to the truth of the allegations in paragraph 43 and therefore deny same.

44. The Culper Report included photos from multiple locations of Blink chargers that were severely damaged, and found others that were inaccessible, missing, and/or non-functional. For example, Culper posted photos from its visit to The Hilton La Jolla in San Diego, where Culper "found non-functional screens and chargers filled with cobwebs, indicating that they had been neglected and unused for quite some time."

 

**ANSWER:** Defendants are without knowledge and information sufficient to form a belief as to the truth of the allegations in paragraph 44 and therefore deny same.

45.      Similarly, Culper visited a Kennesaw, Georgia location where Blink claimed to have a charger available for use. However, the Culper Report noted: "all we found was a single charging cord which had been piped outside of an industrial door. We tried the door but were unable to locate the actual charging unit. It's unclear to us how anyone would be able to use the charging cord here even if they wanted to:"



**ANSWER:** Defendants are without knowledge and information sufficient to form a belief as to the truth of the allegations in paragraph 45 and therefore deny same.

**D.      Blink Former Employees Substantiate Culper's Claims**

46.      Plaintiffs' confidential witnesses, who are Blink's former employees, provide support for Culper's findings.

**ANSWER:** Defendants deny the allegations in paragraph 46, except Defendants are without knowledge and information sufficient to form a belief as to whether Plaintiffs' confidential witnesses are Blink's former employees and therefore deny same.

47.     CW-1 worked at Blink as a Regional Sales Lead for Southern California, where he was based in Long Beach, California, from January to April 2020. CW-1 reported to David Levine, Blink's Director of Sales ("Levine"), who reported to Juan Barahona, Blink's Director of Operations ("Barahona"). CW-1 was responsible for commercial and municipal deals for Blink's Level 2 and DC Fast EV charging stations, which were located in parking garages, gas stations, hotels, university campuses, airports, and other public venues. CW-1 primarily operated in California, but also shared territory in Arizona and Nevada with other Sales Representatives.

**ANSWER:** Defendants are without knowledge and information sufficient to form a belief as to the truth of the allegations in paragraph 47 and therefore deny same.

48.     CW-1 stated that the publicly available Blink charging stations he encountered were outdated, had not been serviced, were broken, didn't have proper signage, or generally looked neglected.  CW-1 agreed that the problem was "systemic," as CW-1 only came across two publicly accessible Blink units in his region that appeared to be new models, and stated that at least 90% were older or decrepit, "easy."

**ANSWER:** Defendants are without knowledge and information sufficient to form a belief as to the truth of the allegations in paragraph 48 and therefore deny same.

49.     CW-1 specifically identified the decrepit/non-functioning charging stations present throughout the Southern California region during his tenure and provided evidentiary support.  CW-1 stated that decrepit/non-functioning charging stations were present "all throughout in Long Beach," including a bank of eight units located at a waterfront area restaurant park, another 20 or so were in a parking garage downtown off of Ocean, eight or 10 at the Long Beach Airport, and 10 each were at two other locations in Long Beach. For example, CW-1 provided Lead Plaintiffs with pictures of old Blink EV chargers that Blink acquired located in Long Beach on Pine and Shoreline Drive:



**ANSWER:** Defendants are without knowledge and information sufficient to form a belief as to the truth of the allegations in paragraph 49 and therefore deny same.

50. According to CW-1, these Blink charging units were replaced a month after he took these pictures with ChargePoint units because, as described below, Blink lost the contract with the City of Long Beach for lack of responsiveness to servicing these old units.

**ANSWER:** Defendants are without knowledge and information sufficient to form a belief as to the truth of the allegations in paragraph 50 and therefore deny same.

51. CW-1 also stated that, "if you travel to the Ikeas in the Southern California area, you would have seen a lot of older Blink units," including old units at the Torrance and Costa Mesa Ikea locations. CW-1 provided Lead Plaintiffs with pictures of old charging units located at a Southern California IKEA, which Blink acquired years ago from ECOtality and was representing was a part of its public charging system:

17



**ANSWER:** Defendants are without knowledge and information sufficient to form a belief as to

the truth of the allegations in paragraph 51 and therefore deny same.

52.     CW-1 stated that there were at least 20 inoperable Blink units also scattered across San Diego, "as there were older Blink units at park and ride locations."

**ANSWER:** Defendants are without knowledge and information sufficient to form a belief as to

the truth of the allegations in paragraph 52 and therefore deny same.

53.     Blink, however, made the conscious business decision not to make efforts to repair these chargers.  Consistent with the Culper Report's claims, CW-1 stated that Blink did not want to service these units, as "it was a cash-flow thing.  They did not want

to invest money right away to swap out those old stations." Instead, the Company's strategy was to get customers to sign onto new service contracts for these older units that were part of the acquisition or to get those customers to purchase new units.  CW-1 explained that in addition to not wanting to spend money to address these problems, Blink did not fix the stations because rehabbing or replacing existing stations would not be logged as a new sale (i.e., sales growth).

**ANSWER:** Defendants deny the allegations in paragraph 53, except Defendants are without knowledge and information sufficient to form a belief as to statements made by CW-1 and therefore deny same.

54.     Blink's decision not to invest the capital in replacing or servicing the legacy units posed serious challenges to its sales personnel. CW-1 stated, "The problem it created for me as a rep was I had to deal with and address those older units." According to CW-1, Blink's failure to maintain stations "definitely had an impact on sales."  CW-1 stated that requests frequently came in from municipalities such as Long Beach, California, to service or replace the chargers, but no response was given to the municipalities.  "Basically, they (the municipalities) called Blink for service, and the guys that I talked to, my contacts [at the municipalities], were like, 'Blink just ignored them.' . . . . They just decided they were not going [to respond to these requests for service]."  In turn, CW-1 was told by people at the city level for both Long Beach and San Diego that they "had a real problem with Blink." CW-1 confirmed that Blink's senior management knew of this customer relations problem, stating, "Everywhere I turned around, I was dealing with these Blink units and then I was kind of being told to ignore them.  That wasn't coming from David [Levine]; that was coming from the upper echelon of management."

**ANSWER:** Defendants deny the allegations in paragraph 54, except Defendants are without knowledge and information sufficient to form a belief as to statements made by CW-1 and therefore deny same.

55.     CW-1 explained that decrepit/non-functioning charging stations "led to Long Beach not doing a deal with Blink." CW-1 said Long Beach "kicked Blink out" and gave its contracts for EV charging stations to Blink competitor ChargePoint. According to CW-1, the same scenario occurred in San Diego, "where they had very, very old units that Blink had acquired."  CW-1 stated that after conversations with a contact at San Diego's Center for Sustainable Energy, CW-1 went back to Blink and said the problem had to be addressed or the Company's municipal contract relationships would remain imperiled. Although some units in Oceanside, California were replaced, CW-1 confirmed for the large part, in San Diego, "nothing was done."

19

**ANSWER:** Defendants deny the allegations in paragraph 55, except Defendants are without knowledge and information sufficient to form a belief as to statements made by CW-1 and therefore deny same.

56. Blink's failure to replace or service decrepit/non-functioning stations ultimately led to the loss of several other valuable contracts. CW-1 explained that losing the Long Beach and San Diego municipal contracts created a domino effect, as once "Long Beach fell, then so did Santa Monica, so did Redondo, all the way up the coast." CW-1 said he was later told that ChargePoint "won the contract all the way up the coast." Moreover, CW-1 explained that Santa Monica "would not allow Blink to do business with them [because] Blink had left such a bad taste in their mouth." CW-1 said that other Southern California municipalities like Pasadena "didn't even deal with Blink" as these cities often chose to piggyback on other municipalities' contracts.

**ANSWER:** Defendants deny the allegations in paragraph 56, except Defendants are without knowledge and information sufficient to form a belief as to statements made by CW-1 and therefore deny same.

57. CW-1 confirmed that other sales reps had similar experiences or frustrations with the number of Blink charging units in need of service in their regions. These reps included Blink's Northern California Regional Sales Representative Chad Dickens, Greater Atlanta area regional sales leader Lance Artis, and Northwest regional sales leader Amy Hillman. CW-1 said there were older units in the Camelback area of Arizona, for example, and in the Vegas market, so "it wasn't just California that had older units."

**ANSWER:** Defendants deny the allegations in paragraph 57, except Defendants are without knowledge and information sufficient to form a belief as to statements made by CW-1 and therefore deny same.

58. CW-1 confirmed that Blink's C-Suite, including Defendant Farkas, "had to know" that Blink was getting shut out of these contracts "because these aren't like tens of thousands of dollar deals – we're talking hundreds of thousands of dollars [or more and] – five-year contracts," so Blink was getting "locked out for multiple years.' "They all knew it. They all knew it.  They knew exactly what was going on" and they did not try to do anything to fix the issue.

**ANSWER:** Defendants deny the allegations in paragraph 58.

20

59.     Blink's senior management, including Defendant Farkas, were also informed during weekly sales calls that decrepit/non-functioning charging stations were pervasive throughout the Blink Network and this problem was causing sales execution issues. CW-1 explained that he participated regularly in weekly sales, which typically included a large swath of the Company, including Defendant Farkas, Levine, Barahona, Senior Vice President Phil Herman, and Managing Director Marc Berger. CW-1 explained that the calls were conducted using Microsoft Teams, with senior executives largely participating from company headquarters in Florida, technical staff members located in Arizona, and field reps, like himself, were on the line from their home turf (in CW-1's case, Long Beach). CW-1 stated that Defendant Farkas, whom CW-1 claimed "knew everything," sometimes remained silent on the sales calls, but "if something bothered him too much on a call, he would speak up." CW-1 noted that he also knew that Defendant Farkas actively listened to the sales calls because "David [Levine] would call me and say you have to be careful [about what I say on the sales call]," with Levine telling CW-1 "you have to bring stuff to me" before discussing it on the sales call because Farkas and other top-level Blink executives were listening in on the weekly calls.

**ANSWER:** Defendants deny the allegations in paragraph 59, except admit that Blink's senior management, including Farkas, often participated in weekly sales calls.

60.     During one widely attended weekly sales call in February or March 2020, CW-1 raised the issue of people and places not being able to get their Blink chargers fixed. CW-1 stated that he was essentially looking for some "talking points" to use with customers (or potential customers) who were complaining to him that they had been told that although the new Blink had acquired the dilapidated units as part of the Car Charging/Blink deal, [Blink] was not responsible for the maintenance or replacement of the older charging stations. On the call, CW-1 "got blasted" and was corrected by Directors Juan Barahona and David Levine. They told CW-1 "you can't say that" because the maintenance or replacement of older charger stations was in fact Blink's responsibility, but that Blink would not put in the time, effort, or money to fix them. CW-1 was told that [maintenance or replacement of older charger stations] was a subject he should "steer clear" of in the future. According to CW-1, "David [Levine] said, 'We're not going to make any headway' . . . . They didn't want me to waste my time."

**ANSWER:** Defendants deny the allegations in paragraph 60.

61.     Blink's senior management, including Defendant Farkas, were also informed of the systemic problem of decrepit/non-functioning charging stations throughout the Blink Network and sales execution issues through regular regional sales reports. CW-1 stated that Defendant Farkas was very "hands-on," "knew everything that was going on" at Blink and "involved at a granular level to know what kind of sales were coming in." He elaborated that "every week, [Blink's senior executives] wanted [its regional sales leaders] to forecast what [they] had coming in." CW-1

sent in some of these weekly field sales reports. In addition to going over this material weekly on the call, Levine took the forecast information and compiled it into a report, which was conveyed up the ladder and received by Blink executives, including Managing Director Mark Berger, Sr. Vice President Philip Herman and ultimately Defendant Farkas. In one sales report authored by CW-1, CW-1 cited the problem with municipal contracting. Levine later told CW-1 to leave such information out of future reports, as Levine explained to him that Farkas and others reviewed the reports and would not want him focusing on problematic government contracts or publicly available units, but rather "new" business. CW-1 justified disclosing the problem in the report to Levine, stating that he'd been directed to detail what was going on in his market space and that the problem of the defunct stations was relevant. But Levine told CW-1 that "Michael [Farkas] is looking at this. Michael is seeing this."

**ANSWER:** Defendants deny the allegations in paragraph 61, except Defendants are without knowledge and information sufficient to form a belief as to statements made by CW-1 or what others may have told him and therefore deny same.

62.   CW-2 was a Marketing Coordinator at Blink from June 2019 to April 2020 stationed in Miami, Florida. CW-2 reported to Rebecca Gutierrez, Vice President of Marketing, who was responsible for investor-related materials and in turn reported to Defendant Farkas. CW-2 was involved in email campaigns, website editing, attending trade shows, dealing with the press, taking out ads, and cultivating Blink's social media presence.

**ANSWER:** Defendants are without knowledge and information sufficient to form a belief as to the truth of the allegations in paragraph 62 and therefore deny same.

63.   CW-2 stated that Blink's image was tarnished by older units in the field, agreeing that the problem was "definitely" systemic. CW-2 explained that in turn critics would speak their minds on social media or leave a bad review for Blink on a website.  ***CW-2 also stated that if a business acquired a unit 10 years ago and then went out of business, it would still show up on Blink's online map of public charging stations***, suggesting Blink was generating revenue from the charging unit and that it was on the network. CW-2 explained, "All the charging stations show up in [Blink's public mapping system], whether they've been running or they stopped running two years ago. They're all in the system."

**ANSWER:** Defendants deny the allegations in paragraph 63, except Defendants are without knowledge and information sufficient to form a belief as to statements made by CW-2 and therefore deny same.

22

64.     Importantly, CW-2, a marketing coordinator, stated that emphasizing Blink's supposed fleet of 15,000 charging stations in the marketing plan was paramount, yet CW-2 was not sure how the Company arrived at that number, and saw no indication that Blink pulled a report to say how many stations are running right now across the country.

**ANSWER:** Defendants deny the allegations in paragraph 64, except Defendants are without knowledge and information sufficient to form a belief as to statements made by CW-2 and therefore deny same.

65.     CW-2 went on to say that the "back end" tracked the Blink Network's status and it was very common for charging stations to be out of service. CW-2 added that if there were a group of three charging stations clustered together, it was commonplace to find that at least one of them was out of service. The focus, according to CW-2, was not on usage and fixing underperforming existing units, but to get as many stations in as many locations as possible.

**ANSWER:** Defendants deny the allegations in paragraph 65, except Defendants are without knowledge and information sufficient to form a belief as to statements made by CW-2 and therefore deny same.

66.     Blink's "private" or internal maps informed Blink's management of the problems with their public charging units. CW-2 explained that Blink's "private" or internal maps provided far more information than the publicly visible map of Blink's charging stations. CW-2 stated, "On our [Blink's] side, you could tell when it [the public charging unit] stopped working, the last day it was charged.  They definitely had information on the Blink side that isn't publicly accessible." CW-2 confirmed that Blink's "private" or internal maps was a searchable database available to Blink senior management.

**ANSWER:** Defendants deny the allegations in paragraph 66, except Defendants are without knowledge and information sufficient to form a belief as to statements made by CW-2 and therefore deny same.

67.     CW-2 also stated that his supervisor, Vice President of Marketing Rebecca Gutierrez, was aware of these problems with Blink's public chargers in the field, as CW-2 frequently asked Gutierrez questions regarding how to respond to customer inquiries. Moreover, Gutierrez personally wanted to see each customer complaint. CW-2 stated that while the first response from Blink to a customer complaint might be automated, thereafter "the response was look[ed] at by customer service or by [Gutierrez] herself." In particular, CW-2, Gutierrez and the marketing team spent

significant time on queries that originated from social media (such as tagging or comments via Twitter).

**ANSWER:** Defendants deny the allegations in paragraph 67, except admit that Gutierrez was the Vice President of Marketing. Defendants are without knowledge and information sufficient to form a belief as to statements made by CW-2 and therefore deny same.

68. CW-3 was a Regional Sales Representative, stationed in Pennsylvania, for Blink's mid-Atlantic region from July 2019 to February 2020. CW-3 was responsible for managing the mid-Atlantic territory for Blink, generating leads for potential customers and contracts, and signing deals. CW-3 worked with what could be considered accounts for public charging stations, as opposed to private-use or residential units not on the Blink Network. CW-3 initially reported to Juan Barahona, Director of Operations, and worked closely with Ted Manser, Regional Vice President of East Coast Sales. Later in CW-3's tenure, CW-3 reported to David Levine, Director of Sales, who reported to CEO Michael Farkas.

**ANSWER:** Defendants are without knowledge and information sufficient to form a belief as to the truth of the allegations in paragraph 68 and therefore deny same.

69. CW-3 participated in weekly sales calls in which Defendant Farkas regularly participated, and asked questions. One issue that frequently came up on these calls was the reputational damage Blink suffered due to non-functioning and dilapidated charging stations out in the field, and that complaints made on social media platforms and other forums were not being addressed in a timely way. CW-3's stated that Sales Representatives in other areas openly reported on these calls that the Company's brand had taken a hit because of the number of non-working and beat-up units in the field. CW-3 stated that CW-3 and at least one other rep, Lance Artis, brought to the group's attention that complaints posted on Yelp and Blink's own Facebook page were not being addressed by the Company. CW-3 stated that it "was quite frustrating" and it didn't help create a positive image.

**ANSWER:** Defendants deny the allegations in paragraph 69, except admit that Farkas participated in certain sales calls. Defendants are without knowledge and information sufficient to form a belief as to statements made by CW-3 and therefore deny same.

70. CW-3 confirmed that Blink's internal databases and reports would have informed Blink's management of the problems with their public charging units. In regard to monitoring of the fleet, CW-3 said that using Blink's internal systems, "you can tell if a unit was on or a unit was off." CW-3 also said usage reports can be run on public charging units. Moreover, Blink would get service complaints or requests

24

for troubleshooting help from clients regarding nonfunctioning public charging
units.

**ANSWER:** Defendants deny the allegations in paragraph 70, except Defendants are without

knowledge and information sufficient to form a belief as to statements made by CW-3 and

therefore deny same.

## V.   MATERIALLY FALSE AND MISLEADING STATEMENTS

### A.   ISSUED DURING THE CLASS PERIOD

#### 1.   Statements in Blink's Q1 2020

71.   The Class Period begins on March 6, 2020, when Blink issued the March 6, 2020
press release entitled "Blink Charging Partners with One of Nation's 50 Fastest
Growing IT Firms to Deliver Charging Stations into Florida's Booming Tech Hub."
The March 6, 2020 press release stated (emphasis added):

> Blink Charging . . . is a leader in electric (EV) charging equipment
> and networked EV charging stations, ***enabling EV drivers to easily
> charge at any of its 15,000 charging station[s]*** (this is a correction
> to our press release from March 5, 2020 where we inadvertently
> referred to our 23,000 deployed charging stations since we began
> our business) . . . .

**ANSWER:** Defendants deny the allegations in paragraph 71, except admit that Blink issued a

press release on March 6, 2020 and refer to the text of the document referenced in that paragraph

for the complete and actual description of its content.

72.   In a March 17, 2020 press release, Blink again stated that "it is a leader in electric
vehicle (EV) charging equipment and networked EV charging stations, ***enabling
EV drivers to easily charge at any of its 15,000 charging [stations]***." (Emphasis
added.)

**ANSWER:** Defendants deny the allegations in paragraph 72, except admit that Blink issued a

press release on March 17, 2020 and refer to the text of the document referenced in that paragraph

for the complete and actual description of its content.

73.   The statements set forth in ¶¶ 71-72 were materially false and misleading regarding
the size and functionality of Blink's networked EV charging stations. During the
Class Period, the Company's functional public charging station network consisted

25

of approximately 2,200 charging stations. Defendants misled investors by misrepresenting and/or failing to disclose that many of the Company's public charging stations shown on Blink's live map were non-existent, damaged, neglected, non-functional, and/or inaccessible.

**ANSWER:** Defendants deny the allegations in paragraph 73.

### 2.    Statements in Blink's Q2 2020

74.    On April 2, 2020, Blink filed its Annual Report on Form 10-K with the SEC, signed by both Individual Defendants (the "2019 Annual Report"). The 2019 Annual Report stated (emphasis added) (sic):

As of December 31, 2019, we had 14,778 charging stations deployed, of which 5,199 were Level 2 commercial charging units, 104 were DC Fast Charging EV chargers and 1,200 were residential charging units in service on the Blink Network. Additionally, as of December 31, 2019, we had 353 Level 2 commercial charging units on other networks and there were also 7,922 non-networked, residential Blink EV charging stations. The nonnetworked, residential Blink EV charging stations are all host owned. In total, over the years the Company has deployed a total of 23,795 in North America (including units that were replaced, removed, discarded, etc.). In addition, the Company's subsidiary in Greece (Blink Charging Hellas SA) has deployed 23 charging stations in Greece (46 plugs) and about to deploy 4 Level 3 (DCFC) units in the first quarter of 2020, while the wholly owned subsidiary in Israel (Blink Charging Ltd.) deployed 17 charging stations (24 plugs) in Israel.

**ANSWER:** Defendants admit the allegations in paragraph 74.

75.    The 2019 Annual Report also stated (emphasis added) (sic):

As of December 31, 2019, the Company has sold or deployed a total of approximately 14,778 charging units, of which, 5,199 were Level 2 commercial charging units, 104 were DC fast charging units and 1,200 were residential charging units. Included in the above total number are approximately 353 Level 2 units deployed on other networks and 7,922 nonnetworked, residential charging units.

**ANSWER:** Defendants admit the allegations in paragraph 75.

76.    The Individual Defendants submitted two signed certifications pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 ("SOX") in connection with Blink's April 2, 2020 filing of its 2019 Annual Report. In these certifications, the Individual Defendants stated that "[b]ased on [their] knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to

26

make the statements made, in light of the circumstances under which such statements are made, not misleading with respect to the period covered by this report."

**ANSWER:** Defendants admit the allegations in paragraph 76.

77. On May 13, 2020, Blink filed its Form 10-Q with the SEC for Blink's first quarter of 2020, signed by both Individual Defendants (the "1Q 2020 10-Q"). The 1Q 2020 10-Q stated:

As of March 31, 2020, the Company had 14,643 charging stations deployed, of which, 5,283 were Level 2 commercial charging units, 103 were DC Fast Charging EV chargers and 1,070 were residential charging units. Additionally, as of March 31, 2020, we had 342 Level 2 commercial charging units on other networks and there were also 7,845 non-networked, residential Blink EV charging stations.

**ANSWER:** Defendants admit the allegations in paragraph 77.

78. The 1Q 2020 10-Q also stated (emphasis added) (sic):

At March 31, 2020, we have sold or deployed a total of approximately 14,643 charging units, of which, 5,283 were level 2 commercial charging units, 103 were DC Fast Charging EV units and 1,070 were residential charging units. Included in the above total number are approximately 342 Level 2 units deployed on other networks and 7,845 non-networked, residential charging units.

**ANSWER:** Defendants admit the allegations in paragraph 78.

79. The Individual Defendants submitted two signed certifications pursuant to Section 302 of SOX in connection with Blink's May 13, 2020 filing of its First Quarter 2020 report on Form 10-Q. In these certifications, the Individual Defendants stated that "[b]ased on [their] knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements are made, not misleading with respect to the period covered by this report."

**ANSWER:** Defendants admit the allegations in paragraph 79.

80. The statements set forth in ¶¶ 74-79 were materially false and misleading regarding the size and functionality of Blink's networked EV charging stations. During the Class Period, the Company's functional public charging station network consisted of approximately 2,200 charging stations. Defendants misled investors by misrepresenting and/or failing to disclose that many of the Company's public charging stations shown on Blink's live map were non-existent, damaged, neglected, non-functional, and/or inaccessible.

27

**ANSWER:** Defendants deny the allegations in paragraph 80.

### 3.   Statements in Blink's Q3 2020

81.   On July 8, 2020, in an interview with Yahoo Finance, Defendant Farkas differentiated Blink from its competitors by stating, "But we decided as an owner and an operator of charging stations, to make sure that we spend our money and put in the ground, we're not going to have to deal with obsolescence."[7]

**ANSWER:** Defendants deny the allegations in paragraph 81 and refer to the text of the document referenced in that paragraph for the complete and actual description of its content.

82.   On August 13, 2020, Blink filed its second quarter 2020 financial report on Form 10-Q (the "2Q 2020 10-Q") with the SEC, signed by the Individual Defendants. The 2Q 2020 10-Q stated the following (in two places): "As of June 30, 2020, the Company had 15,151 charging stations deployed, of which, 5,385 were Level 2 commercial charging units, 102 were DC Fast Charging EV chargers and 1,193 were residential charging units.  Additionally, as of June 30, 2020, the Company had 305 Level 2 commercial charging units on other networks and there were also 8,166 non-networked, residential Blink EV charging stations."

**ANSWER:** Defendants admit the allegations in paragraph 82.

83.   The Individual Defendants submitted two signed certifications pursuant to Section 302 of SOX in connection with Blink's August 13, 2020 filing of its Second Quarter 2020 report on Form 10-Q. In these certifications, the Individual Defendants stated that "[b]ased on [their] knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements are made, not misleading with respect to the period covered by this report."

**ANSWER:** Defendants admit the allegations in paragraph 83.

84.   On August 17, 2020, Blink wrote on its Twitter account that "Blink's network of over 15,000 chargers gives EV drivers the ability to charge their car wherever they live, work, and play."

**ANSWER:** Defendants admit the allegations in paragraph 84.

85.   On August 17, 2020, Blink wrote on its Facebook account that "Blink's network of over 15,000 chargers gives EV drivers the ability to charge their car wherever they live, work, and play."

---

[7] Yahoo Finance, Blink CEO Michael Farkas Joins On The Move with Julie Hyman and Rick Newman, YOUTUBE (July 8, 2020), https://www.youtube.com/watch?v=N0O7LIaEghw.

28

**ANSWER:** Defendants admit the allegations in paragraph 85.

86.    The statements set forth in ¶¶ 81-85 were materially false and misleading regarding the size and functionality of Blink's networked EV charging stations. During the Class Period, the Company's functional public charging station network consisted of approximately 2,200 charging stations. Defendants misled investors by misrepresenting and/or failing to disclose that many of the Company's public charging stations shown on Blink's live map were non-existent, damaged, neglected, non-functional, and/or inaccessible.

**ANSWER:** Defendants deny the allegations in paragraph 86.

## VI.    **THE TRUTH EMERGES**

87.    On August 19, 2020, analyst Culper published a report entitled "Blink Charging Co. (BLNK): You Won't Miss It." Culper wrote, in relevant part:

> [W]e believe that [Blink] has vastly exaggerated the size of its EV charging network in order to siphon money from the pockets of investors to insiders.  Blink claims that "EV drivers can easily charge at any of its 15,000 charging stations," but we estimate that the Company's functional public charging station network consists of just 2,192 stations, a mere 15% of this claim.

**ANSWER:** Defendants deny the allegations in paragraph 87, including that Culper was or is an

analyst, except admit that Culper published the quoted text on August 19, 2020 .

88.    During Culper's investigation, there were only 3,275 active charging stations shown on Blink's live map. Culper sent out investigators who found that Blink's charging stations were not as the Company had represented. Specifically, Culper's report stated, in relevant part: "[M]any of [Blink's charging stations] are in utterly decrepit condition. Our on-the-ground visits to 242 stations at 88 locations across the U.S. revealed a plethora of neglected, abused, nonfunctional, or otherwise missing chargers . . . . ***Blink vastly overstates the size [and] functionality of its chargers***."  (Emphasis added.)

**ANSWER:** Defendants deny the allegations in paragraph 88.

89.    Culper stated that of the 242 stations its investigators visited in the Atlanta, Chicago, Miami, and San Diego metro areas, twenty-three times (9.5% of total), Blink's map claimed that there were chargers on site, but Culper's investigators were either unable to locate the chargers or locate all of the chargers claimed. In thirty-nine cases (16.1% of total), Culper's investigators "found chargers that, even though they existed, were visibly damaged and/or nonfunctional," and that "[a]s many of these chargers have been left to the elements for close to a decade, the most common deformities were due to sun and heat damage." Furthermore, in

another eighteen cases (7.4% of total), Culper's investigators "found that chargers were inaccessible to the general public," and that "[m]any of these were behind locked garages, or restricted only for employee (in office buildings) or resident (in condo or apartment buildings) use only."

**ANSWER:** Defendants deny the allegations in paragraph 89.

90.     The Culper Report included photos, from multiple locations, of Blink chargers that were severely damaged, inaccessible, and/or non-functional. It also included details of interviews with parking attendants and other locals who described the lack of use and/or other issues experienced with the Blink chargers.

**ANSWER:** Defendants deny the allegations in paragraph 90.

91.     ***Culper concluded that roughly a thousand of the 3,275 charging stations listed were missing, inaccessible, or inoperable. "In short, our sampling suggests that of the 3,275 chargers listed on the Company's map, only 67% of these, or 2,192 exist, are functional, and are publicly accessible."*** (Emphasis in original).

**ANSWER:** Defendants deny the allegations in paragraph 91.

92.     On this news, the Company's stock price fell from its August 18, 2020 closing price of $10.23 per share to an August 20, 2020 closing price of $7.94 per share, representing a two day drop of $2.29 per share, or approximately 22.4%.

**ANSWER:** Defendants deny the allegations in paragraph 92, except admit that the Company's

stock price declined.

93.     These revelations contradicted statements made by Defendants during the Class Period and were a causal element of the concurrent decline in the Company's share price.

**ANSWER:** Defendants deny the allegations in paragraph 93.

### VII.     <u>ADDITIONAL ALLEGATIONS DEMONSTRATING SCIENTER</u>

**A.     Defendants Had Access to Real-Time Data**

94.     Blink's 2019 Annual Report states that the Blink Network is a proprietary, cloud-based network that gave Defendants access to pertinent data including real-time station status, payment processing, detailed charging session information, and monitoring and troubleshooting stations remotely, as well as standard and customized reporting capabilities on, among others, energy dispensed, greenhouse gases reduced, oil barrels saved and gallons of fuel saved.

**ANSWER:** Defendants deny the allegations in paragraph 94 and refer to the text of the document referenced in that paragraph for the complete and actual description of its content.

95. In an interview on August 25, 2020 with JMac Investing, Defendant Farkas verified Defendants' access to real-time data and knowledge of any issues with charging stations.  With respect to charging stations on the Blink Network, Blink can ping them, see what status they are in, and send people over to the charging stations.

**ANSWER:** Defendants deny the allegations in paragraph 95 and refer to the text of the document referenced in that paragraph for the complete and actual description of its content.

**B.     Defendant Farkas Had Intimate Knowledge of Blink's Business, Including Sales and Charging Station Issues**

96. CW-1 described Defendant Farkas as being very "hands-on," "knew everything that was going on" at Blink, and "involved at a granular level to know what kind of sales were coming in."  CW-1 stated that Levine told him that Farkas was looking at weekly sales forecast information.

**ANSWER:** Defendants are without knowledge and information sufficient to form a belief as to the truth of the allegations in paragraph 96 and therefore deny same.

97. CW-1 and CW-3 both stated that Farkas was on weekly sales calls where the charging station issues were discussed and asked questions.

**ANSWER:** Defendants are without knowledge and information sufficient to form a belief as to the truth of the allegations in paragraph 97 and therefore deny same.

**C.     The Fact that the Alleged Misstatements Concerned the Company's Core Business Further Supports an Inference of Scienter**

98. The alleged fraud relates to Blink's core business during the time period in which the Individual Defendants were at Blink's helm. The Individual Defendants, in their roles as top-level executives, would have been aware of all relevant issues impacting the very core of their business.

**ANSWER:** Defendants deny the allegations in paragraph 98.

31

**D.      Six Days After the Culper Report Was Issued, Defendant Farkas Admitted that There Were Only About 5,000 Publicly Available Charging Stations on the Blink Network**

99.      In an interview on August 25, 2020 with JMac Investing, Defendant Farkas admitted that there were only "about 5,000 and change or so" of "publicly available charging stations" on the Blink Network.

**ANSWER:** Defendants deny the allegations in paragraph 99 and refer to the text of the document referenced in that paragraph for the complete and actual description of its content.

**E.      Defendant Farkas Fired James Christodoulou, Blink's Director, President and Chief Operating Officer, at the Start of the Class Period After He Voiced Concerns about Potential Violations of SEC Regulations and NASDAQ Rules**

100.     This is not the first time that allegations of securities fraud have been lodged against Defendant Farkas. The Culper Report also noted the suspicious departure on March 13, 2020 of James Christodoulou, who was employed at Blink from August 2018 to March 2020 as Blink's Director, President, and Chief Operating Officer. Christodoulou was fired on March 13, 2020 because of allegations of workplace misconduct. But Christodoulou sued the Company just days later, alleging that he was fired because he voiced concerns about potential violations of SEC regulations and NASDAQ rules, including, inter alia, that Defendant Farkas personally transferred 300,000 shares of Blink stock in 2018 with a market value of more than $1 million to an independent Blink Director, thereby potentially compromising that Director's independence.

**ANSWER:** Defendants deny the allegations in paragraph 100, except admit that Christodoulou was COO at Blink from August 2018 to March 2020 and served as President and a Director, Christodoulou was terminated for cause in March 2020 for willful misconduct stemming from violations of the Company's employment policies , sued the Company and reached a settlement for $400,000 in October 2020.

101.     Shortly after the instant securities fraud action was filed in August 2020, the Company, on October 9, 2020, filed a Form 8-K with the SEC, signed by Defendant Farkas, announcing a settlement with Christodoulou (the "October 9, 2020 Form 8-K"). The October 9, 2020 Form 8-K stated: "Effective October 9, 2020, the Company settled the litigation by James Christodoulou, its former President and Chief Operating Officer. In connection with a review arising from the settlement process, the Company determined that the termination of Mr. Christodoulou should be and has been reclassified as 'without cause'. The settlement includes compensation with the reclassification."

**ANSWER:** Defendants deny the allegations in paragraph 101, except admit that the Company filed a Form 8-K with the SEC on October 9, 2020 and refer to the text of the document referenced in that paragraph for the complete and actual description of its content.

102. During Plaintiffs' counsel's investigation, Christodoulou stated that he believes all of the allegations in his complaint are true. "I have documentation and other peoples' corroboration. There's nothing in my suit that's frivolous or untrue."

**ANSWER:** Defendants deny the allegations in paragraph 102, except Defendants are without knowledge and information sufficient to form a belief as to the truth of the allegations in paragraph 102 and therefore deny same.

## VIII.   CLASS ACTION ALLEGATIONS

103. Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23 on behalf of a class, consisting of all persons and entities that purchased or otherwise acquired Blink securities between March 6, 2020 and August 19, 2020, inclusive, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

**ANSWER:** Defendants are without knowledge and information sufficient to form a belief as to the truth of the allegations in paragraph 103 and therefore deny same.

104. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Blink securities actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are at least hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Blink or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

**ANSWER:** Defendants are without knowledge and information sufficient to form a belief as to the truth of the allegations in paragraph 104 and therefore deny same.

105. Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

**ANSWER:** Defendants are without knowledge and information sufficient to form a belief as to the truth of the allegations in paragraph 105 and therefore deny same.

106. Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

**ANSWER:** Defendants are without knowledge and information sufficient to form a belief as to the truth of the allegations in paragraph 106 and therefore deny same.

107. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

   a. whether the federal securities laws were violated by Defendants' acts as alleged herein;

   b. whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about Blink's business;

   c. whether Defendants acted knowingly or recklessly in issuing false and misleading statements;

   d. whether the prices of Blink securities during the Class Period were artificially inflated because of Defendants' conduct complained of herein; and

   e. whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

**ANSWER:** Defendants are without knowledge and information sufficient to form a belief as to the truth of the allegations in paragraph 107 and therefore deny same.

108. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

**ANSWER:** Defendants deny the allegations in paragraph 108.

109.    The market for Blink's securities was open, well-developed and efficient at all relevant times.  As a result of the materially false and/or misleading statements and/or failures to disclose, Blink's securities traded at artificially inflated prices during the Class Period.  Plaintiffs and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of Blink's securities and market information relating to Blink and have been damaged thereby.

**ANSWER:** Defendants deny the allegations in paragraph 109.

110.    During the Class Period, the artificial inflation of Blink's shares was caused by the material misrepresentations and/or omissions particularized in this Amended Complaint causing the damages sustained by Plaintiffs and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Blink's business.  These material misstatements and/or omissions created an unrealistically positive assessment of Blink and its business, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company shares.  Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiffs and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

**ANSWER:** Defendants deny the allegations in paragraph 110.

111.    At all relevant times, the market for Blink's securities was an efficient market for the following reasons, among others:

a.      Blink shares met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

b.      As a regulated issuer, Blink filed periodic public reports with the SEC and/or the NASDAQ;

c.      Blink was followed by a number of securities analysts employed by major brokerage firms who wrote reports that were widely distributed and publicly available; and/or

d.      Blink regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services.

35

**ANSWER:** Defendants are without knowledge and information sufficient to form a belief as to

the truth of the allegations in paragraph 111 and therefore deny same.

112.   As a result of the foregoing, the market for Blink's securities promptly digested current information regarding Blink from all publicly available sources and reflected such information in Blink's share price. Under these circumstances, all purchasers of Blink's securities during the Class Period suffered similar injury through their purchase of Blink's securities at artificially inflated prices and a presumption of reliance applies.

**ANSWER:** Defendants deny the allegations in paragraph 112.

113.   A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions. Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business – information that Defendants were obligated to disclose – positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.  Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

**ANSWER:** Defendants deny the allegations in paragraph 113.

## IX.   FIRST CLAIM

**Violation of Section 10(b) of the Exchange Act and
Rule 10b-5 Promulgated Thereunder
Against All Defendants**

114.   Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

**ANSWER:** Defendants re-allege and incorporate by reference their answers to ¶¶ 1-113 above as

if fully set forth herein**.**

115.   During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did:  (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; and (ii) cause Plaintiffs and other members of the Class to purchase Blink's securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each defendant, took the actions set forth herein.

36

**ANSWER:** Defendants deny the allegations in paragraph 115.

116.    Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Blink's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5.  All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

**ANSWER:** Defendants deny the allegations in paragraph 116.

117.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Blink's financial wellbeing and prospects, as specified herein.

**ANSWER:** Defendants deny the allegations in paragraph 117.

118.    Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Blink's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Blink and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

**ANSWER:** Defendants deny the allegations in paragraph 118.

119.    Each of the Individual Defendants' primary liability and controlling person liability arises from the following facts:  (i) the Individual Defendants were high-level executives at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's business at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

37

**ANSWER:** Defendants deny the allegations in paragraph 119.

120.    Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Blink's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities.  As demonstrated by Defendants' overstatements and/or misstatements of the Company's business throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

**ANSWER:** Defendants deny the allegations in paragraph 120.

121.    As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Blink's securities was artificially inflated during the Class Period.  In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiffs and the other members of the Class acquired Blink's securities during the Class Period at artificially high prices and were damaged thereby.

**ANSWER:** Defendants deny the allegations in paragraph 121.

122.    At the time of said misrepresentations and/or omissions, Plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiffs and the other members of the Class and the marketplace known the truth regarding the problems that Blink was experiencing, which were not disclosed by Defendants, Plaintiffs and other members of the Class would not have purchased or otherwise acquired their Blink securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

**ANSWER:** Defendants deny the allegations in paragraph 122, except Defendants are without knowledge to what Plaintiffs, or other members of the purported class, knew or did or would have done.

123.    By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

**ANSWER:** Defendants deny the allegations in paragraph 123.

124.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

**ANSWER:** Defendants deny the allegations in paragraph 124.

WHEREFORE, Defendants demand judgment in their favor with prejudice on the First Claim.

## X.    SECOND CLAIM

### Violation of Section 20(a) of the Exchange Act
### Against the Individual Defendants

125.    Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

**ANSWER:** Defendants re-allege and incorporate by reference their answers to ¶¶ 1-124 above as if fully set forth herein.

126.    The Individual Defendants acted as controlling persons of Blink within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, the Individual Defendants participated in or were aware of the Company's false and misleading statements disseminated to the investing public, and had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading.  The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

**ANSWER:** Defendants deny the allegations in paragraph 126.

127.    In particular, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular statements giving rise to the securities violations as alleged herein, and exercised the same.

39

**ANSWER:** Defendants deny the allegations in paragraph 127.

128.    As set forth above, Blink and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Amended Complaint. By virtue of Case 1:20-cv-23527-KMW Document 40 Entered on FLSD Docket 02/19/2021 Page 41 of 44 42 their position as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

**ANSWER:** Defendants deny the allegations in paragraph 128.

WHEREFORE, Defendants demand judgment in their favor with prejudice on the Second Claim.

**AFFIRMATIVE DEFENSES**

Defendants state the following defenses and affirmative defenses without assuming the burden of proof on any such defenses that would otherwise fall on Plaintiffs.

1.    The Complaint fails to state a claim against any Defendant upon which relief can be granted.

2.    The claims in the Complaint are contradicted by documentary evidence.

3.    The claims in the Complaint are barred, in whole or in part, by the doctrines of laches, waiver, equitable estoppel, ratification and/or unclean hands.

4.    The claims in the Complaint are barred, in whole or in part, because Plaintiffs lack standing to pursue claims against Defendants.

5.    The claims in the Complaint are barred, in whole or in part, because Defendants did not act with scienter.

6.    The claims in the Complaint are barred, in whole or in part, because any alleged false statement or omission identified in the Complaint was not material.

7.     The claims in the Complaint are barred, in whole or in part, because Defendants have not made any untrue statements of material fact nor have they omitted any material facts necessary to make their statements not misleading.

8.     The claims in the Complaint are barred, in whole or in part, because all allegedly material information allegedly omitted from Defendants' public statements and the Company's public filings was already disclosed to and known by the market.

9.     The claims in the Complaint are barred, in whole or in part, because Defendants had no duty to disclose the allegedly omitted information.

10.     The claims in the Complaint are barred, in whole or in part, because Defendants had no duty to characterize disclosed facts pejoratively.

11.     The claims in the Complaint are barred, in whole or in part, because the Complaint fails to plead fraud with particularity as required by Federal Rule of Civil Procedure 9(b) and/or the requirements of the Private Securities Litigation Reform Act of 1995 ("PSLRA").

12.     The claims in the Complaint are barred, in whole or in part, because the statements alleged in the Complaint to be false and misleading are forward-looking statements accompanied by meaningful cautionary language and are therefore not actionable under the safe harbor provisions of the PSLRA and/or the bespeaks caution doctrine.

13.     The claims in the Complaint are barred, in whole or in part, because the alleged misstatements were puffery and/or statements of optimism.

14.     The claims in the Complaint are barred, in whole or in part, because the statements that Plaintiffs challenge are non-actionable statements of opinion.

15.     The claims in the Complaint are barred, in whole or in part, because of the lack of loss causation and because Defendants' public statements did not cause any losses.

16. The claims in the Complaint are barred, in whole or in part, because of the lack of transaction causation.

17. The claims in the Complaint are barred, in whole or in part, because of the lack of price impact.

18. The claims in the Complaint are barred, in whole or in part, because this action may not be maintained as a class action pursuant to Federal Rule of Civil Procedure 23.

19. The claims in the Complaint are barred, in whole or in part, because Plaintiffs are not adequate or appropriate class representatives.

20. The claims in the Complaint are barred, in whole or in part, because the injuries Plaintiffs sustained, if any, were caused by the actions or inactions of parties other than Defendants, or outside the control of Defendants, or caused by economic events that were outside the control of Defendants. These actions, inactions, and events were intervening or superseding causes of Plaintiffs' alleged injuries.

21. The claims in the Complaint are barred, in whole or in part, because the actions or inactions of Defendants were not the sole or partial cause of any decision by Plaintiffs to purchase the Company's shares.

22. The claims in the Complaint are barred, in whole or in part, because any alleged depreciation in the value of the Company's shares resulted from factors other than the misstatements or omissions alleged in the Complaint.

23. The PSLRA requires that any liability of Defendants under the federal securities laws be determined in accordance with the proportionate fault provisions of 15 U.S.C. § 78u-4. Accordingly, Defendants are entitled to a submission asking the jury to assess the percentage of

fault of each Individual Defendant and/or other persons or entities that the jury finds contributed to cause the harm alleged by Plaintiffs (if any).

24.     Plaintiffs are limited to only those damages authorized by the Securities Exchange Act of 1934 and the PSLRA and Plaintiffs may not recover damages in excess of those authorized by these statutes or the regulations promulgated pursuant to these statutes.

25.     Defendants are or may be entitled to indemnification from others including other Defendants for all or part of any judgment recovered against them.

26.     The claims in the Complaint are barred, in whole or in part, because Defendants' actions at all times were undertaken in good faith and for the benefit of investors.

27.     Plaintiffs' claim under Section 20(a) of the Exchange Act of 1934 ("Exchange Act") against the Individual Defendants is barred, in whole or in part, because they are not "control persons" within the meaning of Section 20(a).

28.     Plaintiffs' Section 20(a) claim against the Individual Defendants is barred, in whole or in part, because Defendants did not violate the federal securities laws. Thus, Defendants did not commit a primary violation for which the Individual Defendants could be secondarily liable.

29.     The claims in the Complaint are barred, in whole or in part, because Plaintiffs never relied on any alleged statements, acts, or omissions of Defendants.

30.     The claims in the Complaint are barred, in whole or in part, because Plaintiffs had actual or constructive knowledge of the allegedly untrue statements of material fact, omissions of material fact, misleading statements, or other actions by Defendants set forth in the Complaint, and therefore assumed the risk of any alleged damages actually and/or legally caused thereby.

31.     The claims in the Complaint are barred, in whole or in part, by Plaintiffs' own actions, omissions, and/or negligence.

32.     The claims in the Complaint are barred, in whole or in part, because Plaintiffs failed to mitigate their alleged damages. Without admitting that Plaintiffs suffered damages in any amount, or that Defendants are or should be liable for any such damages, to the extent that Plaintiffs failed to mitigate any damages referred to in the Complaint, any recovery against Defendants must be reduced by that amount.

33.     The claims in the Complaint are barred, in whole or in part, because Defendants relied in good faith on the advice and/or unqualified opinions of Blink's independent auditors.

34.     The claims in the Complaint are barred, in whole or in part, because the financial statements that Plaintiffs complain about (either directly or indirectly through allegations about statements and/or press releases based thereon) were audited by Blink's independent auditors and approved by such independent auditors as presenting fairly, in all material respects, Blink's financial condition in accordance with Generally Accepted Accounting Principles.

35.     The claims in the Complaint are barred, in whole or in part, because Plaintiffs' damages, if any, are too speculative or remote to ascertain with reasonable certainty.

Defendants reserve and assert all defenses and affirmative defenses available under any applicable law or regulation. Defendants reserve the right to assert any additional defenses or affirmative defenses that may develop during the litigation of this action or to correct, supplement, or amend these affirmative defenses up through and including trial.

**TRIAL BY JURY DEMANDED**

Defendants demand a trial by jury on all claims so triable.

**PRAYER FOR RELIEF**

WHEREFORE, Defendants respectfully request that the Court:

(a)     dismiss the Complaint against each Defendant in its entirety with prejudice or,

alternatively, enter judgment in Defendants' favor;

(b)   award reasonable attorneys' fees and costs to Defendants; and

(c)   grant such other and further relief as the Court deems just and proper.

Dated: December 18, 2023                    Respectfully submitted,

**HOLLAND & KNIGHT LLP**

*/s/ Tracy A. Nichols*
Tracy A. Nichols (FBN 454567)
Stephen P. Warren (FBN 788171)
Allison Kernisky (FBN 41160)
701 Brickell Avenue, Suite 3300
Miami, FL  33131
Telephone: (305) 374-8500
Facsimile:  (305) 789-7799
tracy.nichols@hklaw.com
stephen.warren@hklaw.com
allison.kernisky@hklaw.com

*Counsel for Defendants Blink Charging Co.,*
*Michael D. Farkas and Michael P. Rama*

**<u>CERTIFICATE OF SERVICE</u>**

I HEREBY CERTIFY that on December 18, 2023, I electronically filed the foregoing document with the clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF.

*<u>/s/ Tracy A. Nichols</u>*
Tracy A. Nichols
